Patrick E. LEE and Marlon A. Chin, Appellants,

v.

UNITED STATES, Appellee.

Nos. 90–CF–229 and 90–CF–262.

District of Columbia Court of Appeals.

Argued May 21, 1996.
Decided Aug. 14, 1997.
As Amended Sept. 30, 1997.

Gregory B. Macaulay, appointed by this court, Washington, DC, for appellant Lee.

Dennis M. Hart, appointed by this court, Washington, DC, for appellant Chin.

Leslie A. Blackmon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the

brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellees.

Before FERREN, TERRY, and REID, Associate Judges.

TERRY, Associate Judge:

After terrorizing and shooting three women in the face at point-blank range and shooting a fourth woman in the arm, appellants Lee and Chin were jointly charged with two counts of first-degree premeditated murder while armed,[1] six counts of first-degree felony murder while armed,[2] two counts of assault with intent to kill (AWIK) while armed,[3] one count of mayhem while armed,[4] one count of armed robbery,[5] two counts of first-degree burglary while armed,[6] and one count of assault with a dangerous weapon (ADW).[7] Each was separately charged, in addition, with one count of carrying a pistol without a license.[8] After a trial lasting almost three weeks, Chin was found guilty of all but one of the charges: the jury acquitted him of ADW. Lee was found guilty as charged,[9] except that (1) on each of the two counts of first-degree premeditated murder while armed, the jury found him guilty of the lesser included offense of second-degree murder while armed, and (2) on each of the two counts of AWIK while armed, he was found guilty of the lesser included offense of ADW.

On appeal from their convictions, Lee and Chin jointly claim that the trial court unduly restricted their use of peremptory challenges during the *voir dire* of the jury, and that several of their convictions merge. Lee inde-

pendently challenges the sufficiency of the evidence supporting his convictions of burglary and felony murder, and he asserts plain error in the court's instructions on accomplice liability for felony murder. Chin separately maintains that the trial court abused its discretion when it refused to impose Jencks Act sanctions on the government for its failure to preserve certain police notes. He also assigns as error the trial court's refusal to conduct a *voir dire* of the jury during its deliberations. We reject all of these arguments except the one involving merger. Under established principles, we agree with appellants (and the government) that the case must be remanded to the trial court for resentencing. In all other respects, the convictions of both appellants are affirmed.[10]

I

The government's principal witnesses at trial were the two surviving victims, Christine Brown and Carmetta Dean. On February 20, 1988, Christine Brown and her husband, Owen Brown, were living in an apartment on Meridian Place, S.E. Ms. Dean, who was Owen Brown's sister, lived there as well with her two-year-old daughter, Roxanne Dean. Also dwelling in the apartment were Ms. Dean's niece, Urcella O'Connor; Ms. O'Connor's twenty-month-old daughter, Virgilia O'Connor; Owen Brown's two-year-old nephew, Durrell Graves; Christine Brown's sister, Shardeen Britt; and Britt's two-year-old daughter, Colleen Britt. Appellant Chin was Ms. Britt's boy friend at the time and was the father of Colleen.[11]

1. D.C.Code §§ 22–2401, 22–3202 (1996).

2. D.C.Code §§ 22–2401, 22–3202 (1996).

3. D.C.Code §§ 22–501, 22–3202 (1996).

4. D.C.Code §§ 22–506, 22–3202 (1996).

5. D.C.Code §§ 22–2901, 22–3202 (1996).

6. D.C.Code §§ 22–1801(a), 22–3202 (1996).

7. D.C.Code § 22–502 (1996).

8. D.C.Code § 22–3204 (1996).

9. At the close of the government's case, the trial court granted Lee's motion for judgment of acquittal on the ADW count. All the other charges went to the jury.

10. Lee also noted an appeal from the denial of a motion to vacate sentence under D.C.Code § 23–110 (1996). That appeal was consolidated with Lee's direct appeal, but was later dismissed on Lee's motion. *Lee v. United States*, No. 94–CO–1157, order filed April 18, 1996 (unpublished).

11. The Browns and Carmetta Dean met Chin in 1985, when all of them were living in New York. Christine Brown also met appellant Lee, whom

At approximately 7:00 p.m., Chin called the apartment and asked if he could come over to visit his daughter Colleen.[12] Chin arrived a few minutes later, accompanied by Lee and two other men known only as "Prince" and "Butter." When the four men entered the apartment, Carmetta Dean was in the kitchen cooking dinner; Christine Brown was resting in bed; and Shardeen Britt, Urcella O'Connor, and the children were in the living room watching television. When Brown heard Chin come into the apartment, she called to him from the bedroom, asking if he wanted her. Chin said he did not and closed the bedroom door. A few seconds later, Urcella O'Connor went into the bedroom and told Brown that Chin had a gun and that three other people were with him. Ms. Brown jumped up and started to put on some clothes. She was half-dressed, with slacks but no shirt, when Chin entered the bedroom with a gun in his hand. He immediately told Brown and O'Connor to get down on the floor. After Brown said that Chin must be joking, Lee entered the room, tore the receiver off the telephone and threw it down, and said it was "no joke" and ordered them to lie on the floor. Brown told Lee and Chin that they were crazy, and then demanded that they "get the hell out of my house." In response, Lee shoved Brown, punched her in the face hard enough to knock her to the floor, and then stomped on her chest repeatedly with his foot.[13] As Brown begged Chin for help, Chin stood by, laughing, with the gun still in his hand. Urcella O'Connor sat on the bed crying.

At this point Prince entered the bedroom holding another gun, which he had "prepared like ... he was going to shoot." He then brought Shardeen Britt into the room, and asked the women where Owen Brown was and whether there was anything of value in the house.[14] Brown replied that Owen had just left; she and O'Connor then pleaded with Prince to spare their lives. Prince told them that "nobody [was] going to get killed."[15] Chin, however, began to threaten Britt by telling her that she was not going to see her baby again, meaning that he was going to kill her. Chin then told Britt to go into one of the other rooms, but she refused.

Just then two-year-old Durrell Graves appeared in the bedroom doorway. Seeing Chin with the gun in his hand, Durrell walked back into the living room and returned to the bedroom with a toy gun. He pointed it at Chin and said, "Pow, pow, Marlon." Chin then put his gun into his waistband, picked up Durrell, and placed a knife to the child's throat.[16] The women in the room cried out, "No, Marlon, don't. Don't, please." Prince told Chin to put the boy down, and Chin eventually complied. Durrell began to cry, and Chin said, "You don't know this boy. He's bad." When Ms. Brown began to protest, Chin came over to her with the knife still in his hand and threatened to cut her with it. After Brown

she knew as "Jack," when she lived in New York. The Browns moved to Washington in December 1987 and initially lived in a house on Gresham Street with Chin, Shardeen Britt, and their child Colleen. In January 1988, Chin, Britt, and Colleen moved to Trenton, New Jersey; at about the same time, the Browns moved to the Meridian Place apartment.

12. Before asking if he could visit his child, Chin asked Christine Brown, who answered the telephone, if her husband Owen was at home. She told him that Owen had just left for work.

13. Despite this assault, Brown never saw Lee holding a gun. Dean testified that she never heard Lee threaten anyone, although she did not enter the bedroom until a few minutes later.

14. Christine Brown testified about a telephone conversation she had had with Britt and Chin on February 15, a few days before the shooting.

Chin wanted Christine Brown to "take Owen's money and his stuff and come to New Jersey." He also told Christine that if she were to send Britt the $100 train fare to Washington, "he was going to take it, and if she [Britt] came [to Washington] he was going to kill her," adding that Britt "was down there sleeping with all his friends and he couldn't take it any more." After this conversation, Ms. Brown wired her sister $100; Ms. Britt and Colleen came to live with the Browns that same day.

15. At some point, Prince put the gun in his pants pocket and never took it out again.

16. The ADW count, on which the trial court granted Lee's motion for judgment of acquittal and on which the jury acquitted Chin, was based on this assault.

begged Lee for help, Lee finally pushed Chin away from her.

Chin then left the bedroom and went into the kitchen. He pointed his gun at Carmetta Dean's head, grabbed her by the collar, and told her to go into the bedroom.[17] She went, followed by her two-year-old daughter Roxanne. As she entered the room, Dean saw that Urcella O'Connor was seated on the bed, holding her baby in her lap; Shardeen Britt was also on the bed, holding her baby; and Christine Brown was lying on the floor. Chin pushed Dean down next to a chest of drawers; her daughter stood next to her. Chin then yelled at Dean to "stop looking at him" because she resembled her brother, Owen Brown. He began to approach Dean with his gun pointed at her, but Prince said, "No killing," to which Chin replied, "What are you talking about? ... [She is] Owen's sister ... and if his mother was here, I would kill her too." O'Connor then pleaded with Prince to stop Chin from killing them; Prince again told Chin that there would be "no killing."

Chin eventually stepped away from Dean and ordered the other three men to tie the women up. He pulled the cord out of the telephone and threw it on the bed. Lee and Butter went into the bedroom closet and began removing shoelaces from shoes to bind the women's hands and feet. Butter then gagged Dean with a thick piece of cloth and tied her hands and feet with black shoelaces. Lee tied Brown's hands and gagged her with a pair of sweatpants. Then Lee took a red sweatshirt and tied it around Shardeen Britt's arms, and used black shoelaces to tie O'Connor's feet and hands.[18] Prince, in the meantime, pulled out the drawers of a jewel-ry box on the dresser, removed all of the jewelry, and put it in his pocket.

After the women were bound and gagged, the four men left the bedroom. Almost immediately[19] Chin walked back in, stood over Carmetta Dean, pointed the gun straight at her from a distance of three to four feet, and shot her. Brown and O'Connor screamed, "Oh, God, Marlon." Dean's child cried out, "Mommy, Mommy." Urcella O'Connor then started to get up off the bed, dropping her child as she did so. Chin shot her in the face at close range; she fell on top of Dean, who, though still alive, lay still and pretended to be dead. Christine Brown then tried to crawl under the bed, but Chin stood over her and shot her in the face. He then positioned himself over Shardeen Britt and shot her in the face at close range. According to Dean, the shots were fired "just right after each other, boom, boom, boom, boom." After the four shots, Chin left the room. Dean heard the front door of the apartment slam shortly thereafter.[20]

After the men had left, Christine Brown regained consciousness and, along with Carmetta Dean, managed to get up and untie herself. Shardeen Britt and Urcella O'Connor were dead. Dean went next door to a neighbor's apartment and called the police. When the police came, both Brown and Dean identified Marlon Chin as the shooter, by name, to the first two officers who questioned them. The police also searched the apartment for evidence and found a yellow bag containing $9,175 in cash behind the dresser in the master bedroom. Ms. Brown lost her right eye as a result of her gunshot wound. Ms. Dean was wounded in the upper left arm.

17. According to Dean, about ten to twenty minutes had elapsed since Chin entered the apartment. During this time she was busy fixing dinner and was unaware of what was happening in the bedroom.

18. Neither Brown nor Dean saw O'Connor actually being tied up, but O'Connor's wrists and arms were later found tied with shoelaces behind her back, and a piece of cloth was wrapped tightly around her neck.

19. On direct examination Dean testified that Chin had left for only a few seconds. On cross-examination she said that he had left the room for about sixty seconds. On redirect examination, however, she stated that Chin returned within two seconds.

Brown testified that Chin left the room and then "turn[ed] right back." Although Brown did not hear the men outside the room, Dean said she could hear them talking.

20. A neighbor, Berta Gomez, testified that she heard the sound of more than one person running down the apartment stairs at around 7:15 p.m.

Chin was arrested by local authorities in Kingston, Jamaica, on January 6, 1989, almost a year after the shooting.[21] He gave a written statement to the Jamaican authorities in the presence of two police officers and a justice of the peace. According to this statement, which was introduced at trial, the four men went to the apartment to look for Owen Brown because Brown and his associates had earlier tried to kill Prince and Butter. Although Chin did not say what their intentions were, he did state that Prince went to Miami to buy guns in preparation for the encounter and brought back one .45 caliber automatic, one .357 magnum, and two nine-millimeter pistols. Before arriving at the apartment, the four men "planned that [Chin] should be the one to cause them to get in the house," and Chin "telephoned . . . as planned." After waiting for Owen Brown for half an hour, Prince ordered that the women be tied up. Butter and Lee did as they were told, but Chin claimed that he did not participate. Butter also questioned the women about "the whereabouts of the money" but "got none." Chin searched the apartment for money and cocaine; he found some cocaine, but no money. He then left the apartment, but before leaving he told the others to leave also, adding that they would "find another way to catch [Owen]." He said he heard four or five shots fired as he left the building.

Lee called no witnesses at trial. Chin called one witness, Assistant United States Attorney Frederick Jones, to impeach Ms. Brown's testimony denying that she hid the bag containing the $9,175 during or after the attack.

## II

Both Lee and Chin argue, in slightly different ways, that the *voir dire* procedures employed by the trial judge unfairly impaired their statutory right to make peremptory challenges. *See* D.C.Code § 23–105(a) (1996); Super. Ct.Crim. R. 24(b).[22]

Jury selection began with a venire of sixty-two prospective jurors, the maximum number that could be seated in the courtroom. According to the court's written *voir dire* procedures, all parties were permitted to exercise their peremptory strikes from the venire and from the panel sitting in the box. After strikes for cause were completed, there were only twenty-one prospective jurors left, seventeen short of the thirty-eight jurors needed if all twenty-four peremptory strikes (twelve on each side) were exercised. The judge advised the parties that before he would call for another panel, he intended to go as far as possible with the current panel and summon a new venire only if needed. He reasoned that a second panel would be unnecessary if the parties elected not to use all of their peremptory strikes.

Counsel for both appellants and for the government objected to this procedure, arguing that their exercise of peremptory strikes would be impaired if they were required to use their initial strikes without having a chance to see the second venire. In overruling these objections, the trial judge first noted that "there is no law in this jurisdiction" supporting appellants' proposition.[23] The judge then explained:

> I am not prepared to presume that any number of peremptory strikes are going to be exercised here. If I have fourteen jurors out there, I may empanel them. If any of you want to strike them, then we'll get jurors to replace them, but you don't have any right to view the entire panel before you exercise your peremptory strikes. There's absolutely no law to that effect, and I'm not going to do that, because I don't know whether we need to order fifteen more jurors, twenty-five more

---

21. Lee was arrested by FBI agents three months later, on April 17, 1989, at his home in the Bronx, New York.

22. Super. Ct.Crim. R. 24(b) provides:
 (b) *Peremptory challenges.* All peremptory challenges shall be made at the bench. . . . If the offense charged is punishable by imprisonment for more than one year, each side is entitled to ten peremptory challenges. . . . The prosecution shall be called upon to make the first peremptory challenge with each side proceeding in turn thereafter.

23. In support of his decision, the judge cited *Wells v. United States,* 515 A.2d 1108 (D.C.1986); *Butler v. United States,* 377 A.2d 54 (D.C.1977); and *Armwood v. United States,* 373 A.2d 895 (D.C.1977).

jurors, forty more jurors, or sixty more jurors.

So your objection is noted to this procedure, but that's the way I'm going to do it. Since a party is not entitled to strike from the entire panel,[24] the judge went on to say:

[T]he mere fact that I permit you to strike into the panel doesn't mean ... that you've got to see not only the panel that is now here, but other jurors who might comprise the panel if you exercise all your peremptory strikes.

Finally, the judge observed that the procedure advocated by the parties would impose substantial burdens on the court and would seriously inconvenience the prospective jurors in the first venire. The court's interest in judicial economy, he said, far outweighed the "very attenuated concerns that [were] expressed by counsel."

Following the trial judge's procedure, the government exercised six peremptory strikes, including three passes, while the two appellants (who were exercising their strikes alternately) had exercised a total of five strikes before the first venire was exhausted. The remaining unstruck members of the first panel were excused for the day, and a second venire of forty-two persons was summoned and underwent *voir dire*. Of these, twenty-three were excused for cause. The striking process then resumed, with all the prospective jurors subject to peremptory challenge, both those in the first venire and those in the second venire. Counsel for Lee exercised two strikes against the group and passed on his alternate round. Counsel for Chin exercised four peremptory strikes, including one strike on his alternate round. Of these six strikes, counsel for Chin exercised two of them against members of the first venire, while counsel for Lee exercised one against a member of the first venire.

Both appellants now contend that by altering the peremptory challenge system after the *voir dire* had begun, the trial judge acted

unfairly and prejudicially. Chin argues that he had a right to see the entire panel, both the first and the second venires, before exercising his peremptory challenges. Lee concedes that trial courts do not have to let parties strike from the entire venire. He maintains, however, that the trial judge, having initially permitted the parties to do so, prejudicially erred when he changed the system in the middle of the *voir dire* because the parties had already relied on the procedures announced by the judge at the beginning.

█ The right of peremptory challenge is not constitutionally protected, *see Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988), but it is safeguarded in the District of Columbia by statute[25] and has long been "regarded as necessary to a fair and impartial trial." *Wells v. United States, supra* note 23, 515 A.2d at 1110 n. 1 (citations omitted). Thus in *Wells* and several other cases, this court in the past has held that a defendant need not demonstrate prejudice to obtain reversal of a conviction when a jury selection procedure used by the trial judge frustrates the defendant's effective use of peremptory challenges. *See, e.g., Wilson v. United States,* 606 A.2d 1017, 1025 (D.C.1992); *Williams v. United States,* 552 A.2d 510, 512 (D.C.1988); *Wells,* 515 A.2d at 1111. These cases and others like them, however, were recently overruled in *Lyons v. United States,* 683 A.2d 1066, 1067 (D.C.1996) (en banc). We held in *Lyons* that because the right of peremptory challenge is not constitutionally based, its violation must be viewed as a "trial error" and not a "structural defect" under *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). *See Lyons,* 683 A.2d at 1070–1071. In order to win reversal, then, appellants must show not only that there was error in the trial court's jury selection procedure, but that they suffered prejudice as a result of this error. We need not decide whether

---

24. The judge explained that a party has a right only to see the prospective jurors in the jury box, and that his procedure of allowing counsel to strike into the entire panel was intended merely "to give [counsel] a little wider latitude."

25. D.C.Code § 11–1908(b)(2) (1995) ("An individual summoned for jury service may be ... excluded upon peremptory challenge as provided by law"); *see* Super. Ct.Crim. R. 24(b), *supra* note 22 (prescribing procedures for the exercise of peremptory challenges).

there was error in this case because, even if there was, appellants have not demonstrated prejudice.

■ In *Taylor v. United States*, 471 A.2d 999 (D.C.1983), we addressed a situation similar to the one presented here. After the trial judge in *Taylor* changed the jury selection procedure midway through the *voir dire,* the appellant argued that the alteration was improper because it failed to give advance notice of the peremptory challenge system to be used. In resolving the issue in the government's favor, we said:

> While the trial court has a great discretion in the manner in which to conduct a *voir dire,* we advise trial courts to apprise the parties of the rules which will govern the jury selection prior to the start of the process. . . . In the instant case, however, we find that the oversight of the trial judge was harmless and did not warrant reversal. The record reveals that at the start of the eighth round, the trial court announced that a pass would not count as a strike. We note that at the time of the announcement, the government and the defense counsel had exercised seven strikes each. Thus, even though the announcement was made midway through the exercise of peremptory challenges, it came at a time when both sides were in parity. Therefore, in effect, it was virtually the same as if it had been made at the start of the proceeding. Appellant argues that had the defense known of the trial judge's policy, it likewise would have passed in order to store up some of its challenges. We note, however, that the prosecution could also have used a similar strategy of accumulating challenges. In doing so, of course, either side would run the risk that the other would also have announced that it was satisfied, thus concluding the jury selection process. We hold, therefore, that on these facts the error, if any, did not render the proceed-

ings so fundamentally unfair as to require reversal.

*Id.* at 1004–1005 (citation omitted).

This lengthy excerpt from *Taylor* disposes of the issue before us in this case. Here the procedure to be followed was explained before either side exercised any peremptory challenges. Moreover, by the time the second venire was summoned, both sides had exercised nearly the same number of strikes, six for the government and five for the defense. Because of this substantial parity between the parties, the change affected each side almost equally and therefore created no actual prejudice that would lead to reversal under *Lyons.* Having found no reversible error in *Taylor,* we can find none here either.

### III

In accordance with this court's recommended practice, *see Garris v. United States*, 491 A.2d 511, 513–514 (D.C.1985), the trial court sentenced each appellant on all the counts on which he was convicted, well aware that some of these convictions would merge if they were otherwise affirmed on appeal. Both appellants therefore argue that the case must be remanded to allow the trial court to vacate several convictions and impose a new set of sentences. The government agrees, and so do we.

As to each separate victim,[26] the government concedes that the following convictions merge:

■ 1. All felony murder convictions relating to a single victim merge, and all of the felony murder convictions merge with their underlying felonies. *Catlett v. United States*, 545 A.2d 1202, 1219 (D.C.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989); *Garris,* 491 A.2d at 513–514.

■ 2. The felony murder convictions as to each victim merge with the first-degree murder convictions relating to that same victim (or, in Lee's case, with the second-degree murder convictions). *Byrd v. United States,*

---

**26.** "Crimes do not merge if they are perpetrated against different victims." *Hanna v. United States,* 666 A.2d 845, 855 (D.C.1995). Thus the court "can eliminate the merger claims for counts concerning crimes directed against different victims." *Id.* To use the government's exam-

ples, the murder counts involving Shardeen Britt do not merge with those involving Urcella O'Connor, and neither the ADW nor the armed robbery of Christine Brown merges with the ADW of Carmetta Dean.

510 A.2d 1035, 1036–1037 (D.C.1986) (en banc).

3. Each appellant's two burglary convictions merge. *Hanna, supra* note 26, 666 A.2d at 858.

■ 4. Lee's conviction of ADW of Christine Brown merges with his convictions of both mayhem while armed and armed robbery relating to Ms. Brown. *See Hayward v. United States*, 612 A.2d 224, 226 n. 1 (D.C. 1992) (ADW is a lesser included offense of mayhem while armed); *Moore v. United States*, 599 A.2d 1381, 1383 (D.C.1991) (assault is a lesser included offense of mayhem); *Norris v. United States*, 585 A.2d 1372, 1374 (D.C.1991) (ADW is a lesser included offense of armed robbery).

We agree with the government's assessment and see no additional convictions that need to be vacated.

## IV

Lee separately challenges the sufficiency of the evidence on which the jury found him guilty of armed burglary and felony murder. Viewing the evidence in the light most favorable to the government, *e.g., Marshall v. United States*, 623 A.2d 551, 557 (D.C.1992), we find none of his contentions persuasive.

### A. *Burglary*

Lee maintains that the government failed to prove a burglary because it did not establish that he (or any of the other three men) had the requisite intent to steal, or to commit an assault, at the time they entered the apartment. At most, he contends, the evidence showed that he committed a subsequent crime, which itself does not establish criminal intent at the time of entry.

■ Because the evidence showed that the four men entered the apartment looking for Owen Brown, Lee argues that "the only justifiable inference to be drawn by a reasonable juror was that the subsequent robbery by Prince, and the shootings of the four women by Chin, were the result of [an] intent formed subsequent to the entry." To support this theory, Lee relies primarily on Chin's statement to the police. The jury,

however, was instructed not to consider Chin's statement "in any way in determining the guilt or innocence of Mr. Lee." Moreover, even if the use of Chin's statement had not been thus restricted, it strongly supports an inference that the men entered the apartment with an intent to commit an assault. For the purpose of proving burglary, it does not matter whether they entered with an intent to assault only Owen Brown, both Brown and the women, or just the women.

> [B]ecause burglary consists only of an entry with intent to commit another offense, it is irrelevant that appellant did not actually carry out that intent by assaulting [the intended victim] once he was inside her house.... . [T]he elements of burglary do not include the identity of the victim of the crime which the burglar intends to commit after entering the burglarized premises.

*Bowman v. United States*, 652 A.2d 64, 69–70 (D.C.1994) (citations and footnote omitted).

■ To prove burglary, the government must establish "that the defendant entered the premises having already formed an intent to commit a crime therein." *Warrick v. United States*, 528 A.2d 438, 442 (D.C.1987) (footnote omitted). Such intent, however, is "rarely capable of direct proof," and, unless it is admitted by the accused, it typically must be shown by circumstantial evidence. *Bowman, supra*, 652 A.2d at 67 (citation omitted); *see also Marshall, supra*, 623 A.2d at 557. "Thus unauthorized presence, by itself, is not sufficient to prove a burglary; the government must also show 'other circumstances' that 'might lead reasonable people, based upon their common experience, to conclude beyond a reasonable doubt that appellant intended to commit some crime upon the premises.'" *Bowman*, 652 A.2d at 67 (quoting *Shelton v. United States*, 505 A.2d 767, 770 (D.C.1986)); *see McKinnon v. United States*, 644 A.2d 438, 441 (D.C.), *cert. denied*, 513 U.S. 1005, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994); *(Alfred) Johnson v. United States*, 613 A.2d 888, 900 (D.C.1992). In determining whether the "other circumstances" shown by the government are sufficient to prove intent, however, we have "purposely avoided narrowly defining" this standard, endorsing

instead a case-by-case approach. *McKinnon, supra,* 644 A.2d at 441.

■ The government charged Lee with two counts of armed burglary. In one count he was alleged to have entered the dwelling of Owen and Christine Brown "with intent to commit an assault" and in the other count "with intent to steal." With respect to the former, "the fact that appellant actually committed an assault very soon after he was inside the house is strong circumstantial evidence that he intended to commit an assault at the time he entered." *Bowman, supra,* 652 A.2d at 68 (citation omitted). So is the fact that two of the four men entered the house with weapons "for the purpose of having a confrontation." *McKinnon, supra,* 644 A.2d at 442. The fact that the four men gained entrance to the apartment by a ruse (supposedly to visit Chin's daughter), rather than by force, also supports a finding of intent to assault. *Id.* ("appellant's use of a ruse or strategy to lure his victim back into her apartment ... support[s] a finding of intent [to assault]"); *see United States v. Kearney,* 162 U.S.App. D.C. 110, 114, 498 F.2d 61, 65 (1974) (affirming burglary conviction when burglars had "obtained consent to their entry into the premises under the pretext that they were looking for another person").

Once their ruse had worked, the four men, including Lee, immediately exhibited aggressive behavior. *See Bowman, supra,* 652 A.2d at 68; *(Alfred) Johnson, supra,* 613 A.2d at 900. Chin took out his gun, entered the bedroom, and ordered Brown and O'Connor to lie down on the floor. Lee then entered the room, ripped the receiver off the telephone, and, without any discussion with Chin, told the women that this was "no joke" and that they should get on the floor. When Brown resisted, Lee punched her in the face, knocked her down, and repeatedly stomped his foot into her chest. From these facts, a reasonable juror could easily infer that Lee intended to assault Ms. Brown at the time of his entry.

The evidence also supports an inference that the four men entered the apartment with an intent to steal. Within a short time after they entered, they bound and gagged the four women. Prince asked the others if there was anything to steal in the house, then ransacked the jewelry box and stole its contents in the presence of his three companions. Chin also knew Owen Brown and had previously asked Christine Brown to bring "Owen's money and his stuff" to New Jersey. In addition, more than $9,000 in cash was recovered from a yellow bag behind the dresser in the master bedroom. On this record, a reasonable juror could find that at least one motive for entering the apartment was to carry out a pre-planned theft.

We hold, therefore, that there was sufficient evidence to support Lee's armed burglary conviction.[27]

### B. *Felony Murder*

Lee challenges his felony murder convictions on a different ground. Since he was not the actual triggerman, he must be deemed an aider and abettor in order to be convicted. He claims that the government's evidence did not prove his liability as an aider and abettor of felony murder, because (1) "there was evidence that the shootings were a fresh and independent product of the shooter's mind" and (2) the evidence failed to show that the shootings were "within the scope of a shared or common purpose," or were the "natural and probable consequence" of the underlying felonies. We disagree.

■ Preliminarily, we reiterate the well settled rule that "[o]ne who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed 'in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.'"

---

27. Since the burglary is an element of the main felony murder counts, Lee argues that his felony murder convictions must be reversed because the burglary was not proved. *See Marshall v. United States, supra,* 623 A.2d at 556 ("[a]ny attack upon the burglary conviction ... is necessarily an attack upon the felony-murder charge since commission of the burglary is an element of felony-murder"). Having concluded that there was ample evidence of an armed burglary, we reject this argument summarily.

*West v. United States,* 499 A.2d 860, 865 (D.C.1985) (quoting *Christian v. United States,* 394 A.2d 1, 48 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979)); *see* D.C.Code § 22–105 (1996) (aiders and abettors "shall be charged as principals"). Thus a conviction based on proof that the defendant was an aider and abettor will stand if the government proves "(1) that the offense was committed by someone, (2) that the accused participated in the commission, and (3) that he did so with guilty knowledge." *West,* 499 A.2d at 865 (citations omitted).

In *Waller v. United States,* 389 A.2d 801 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980), we reiterated the requirements for a felony murder conviction:

> First, the defendant or an accomplice must have inflicted injury on the decedent from which [she] died. Second, the injury must have been inflicted in perpetration of a specified felony. No distinction [is] made between the principals and aiders and abettors for purposes of felony murder liability. Only intent to commit the underlying felony need be proved.

*Id.* at 807; *see also Prophet v. United States,* 602 A.2d 1087, 1095 (D.C.1992); *West v. United States, supra,* 499 A.2d at 866; *Christian v. United States, supra,* 394 A.2d at 48; *United States v. Heinlein,* 160 U.S.App. D.C. 157, 167, 490 F.2d 725, 735 (1973). Under this standard, "[a]ll accomplices are culpable for the resulting death," because "the intent requirement for murder, in the case against an aider and abettor, is satisfied solely by the aider and abettor's participation in the felony that resulted in the killing." *Prophet,* 602 A.2d at 1095 (citing *Heinlein,* 160 U.S.App. D.C. at 167, 490 F.2d at 735). Thus, "[i]f the lethal act is in furtherance of their common purpose, the accomplice is guilty even though there was an express agreement not to kill, and even if he actually attempts to prevent the homicide." *Heinlein,* 160 U.S.App. D.C. at 168, 490 F.2d at 736 (quoting *People v.*

*Wood,* 8 N.Y.2d 48, 51–52, 167 N.E.2d 736, 738–739, 201 N.Y.S.2d 328, 333 (1960)).

The converse of this principle is equally well established. "When one of the parties to a felony commits a killing 'outside the scope of the felonious crime which the parties undertook to commit,' the aiders and abettors of the felony cannot be convicted of felony murder." *Butler v. United States,* 614 A.2d 875, 886 (D.C.), *cert. denied,* 506 U.S. 1009, 113 S.Ct. 625, 121 L.Ed.2d 558 (1992) (quoting *Heinlein,* 160 U.S.App. D.C. at 169, 490 F.2d at 737); *see also Christian,* 394 A.2d at 48. Thus "[t]he accomplice who aids and abets is criminally liable for a killing by the principal only if the killing is done 'in furtherance of the common design or plan to commit the [underlying] felony, or [is] the natural and probable consequence of acts done in the perpetration of the felony.'" *Butler,* 614 A.2d at 886 (quoting *Heinlein,* 160 U.S.App. D.C. at 167, 490 F.2d at 735); *accord, e.g., Prophet,* 602 A.2d at 1095; *West,* 499 A.2d at 865. In this case, the felony murder charges were based primarily on the underlying burglary.[28] Lee contends that the murders of O'Connor and Britt were outside the scope of the burglary and that he therefore was improperly convicted of felony murder.

To prove felony murder, the government must establish *"some* causal connection between the homicide and the underlying felony." *(Charles) Johnson v. United States,* 671 A.2d 428, 433 (D.C.1995) (emphasis in original). "Mere temporal and locational coincidence is not enough: '[i]t must appear that there was such actual legal relation between the killing and the crime ... that the killing can be said to have occurred *as a part of the perpetration of the crime ....*'" *Id.* (quoting *Heinlein, supra,* 160 U.S.App. D.C. at 168, 490 F.2d at 736 (emphasis added in *Johnson* )). One way of meeting this requirement is to show that the underlying felony and the killing were "all part of one continuous chain of events." *West,* 499 A.2d at 866. While the burglary in this case "was

---

**28.** Of the six felony murder counts in the indictment, four alleged that the killings occurred while Lee and Chin, and their two companions (unnamed in the indictment), were perpetrating

an armed burglary. The other two felony counts charged Lee and Chin with killing Urcella O'Connor and Shardeen Britt while committing an armed robbery—*i.e.,* the taking of the jewelry.

a separate and distinct act from the killing" and was complete at the time of entry, it nevertheless "may be deemed to be a continuing offense for purposes of the felony-murder statute." *Marshall*, 623 A.2d at 558 (quoting *Blango v. United States*, 373 A.2d 885, 888 (D.C.1977)).

In this case, as in *Marshall* and *Blango*, "[t]he jury was presented with an 'unbroken chain of facts and circumstances which link' the burglary committed at the initial entry and the homicide." *Marshall*, 623 A.2d at 558 (citation omitted). The fact that the four men may have had multiple reasons for entering the house is inconsequential so long as one of those reasons was within the scope of the burglary. *See (Charles) Johnson, supra*, 671 A.2d at 433–434. Having concluded that the evidence was sufficient to prove that Lee (and the others) committed an armed burglary, we have no difficulty in holding that it sufficed as well to prove two felony murders in the course of that burglary.

Once the four men were inside the apartment, Lee continued to assist in the criminal enterprise by—among other things—tying up the women *after* Chin had made clear his intention to kill both Shardeen Britt and Carmetta Dean. Surely at that moment, if not earlier, it was reasonably foreseeable that Chin would carry out this threat, and thus that murder was a natural and probable consequence of the ongoing burglary. We note also that the entire sequence of events lasted for ten to twenty minutes, during which time Lee could have changed his mind and left the apartment if he believed that matters were getting out of hand. The jury could reasonably find "that by not availing himself of opportunities to withdraw from the scene, [Lee] gave his tacit approval and encouragement to what [Chin] was doing," thereby aiding and abetting the criminal en-

terprise. *Settles v. United States*, 522 A.2d 348, 358 (D.C.1987) (citations omitted). Nor can Lee escape liability by asserting that the situation escalated beyond the purpose to which he had agreed. On the contrary, as the government points out in its brief, "the jury could have reasonably concluded that the pre-entry shared purpose to assault and steal ... simply escalated into a shared purpose to commit the ultimate assault by killing the women. While this escalation originated with Chin, Lee knowingly and willingly joined in."

On this record, therefore, we hold that a reasonable jury could have found that the shootings were a means of facilitating the successful completion of the armed burglary, and that the burglary and the killings were "all part of one continuous chain of events." *West*, 499 A.2d at 866. It follows that the evidence was sufficient to sustain Lee's felony murder convictions.[29]

## V

In a related argument, Lee contends for the first time on appeal that the trial court's instructions on felony murder and accomplice liability were erroneous because they failed to tell the jury that the killings must have occurred in the course of, and in furtherance of, the felony. Since this claim was not raised below, we review it for plain error, *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc), and find none.

The standard jury instruction on the felony murder liability of an accomplice states that the killing must have been committed "in the course of the felony and in furtherance of the common purpose to commit the felony." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.22(A), (C) (3d ed.1978);[30] *see also Christian, supra*, 394

---

**29.** Lee also contends that the evidence was insufficient to support his convictions of the other shooting-related offenses—second-degree murder while armed, mayhem while armed, and ADW. For essentially the same reasons that we have discussed in connection with felony murder, we hold that the evidence was sufficient as to these convictions as well, both because the shooting-related offenses were committed in furtherance of the common purpose and because they were

the natural and probable consequences of the burglary. *See West, supra*, 499 A.2d at 865.

**30.** Instruction No. 4.22(C), captioned "When there are multiple defendants," states:

If two or more persons, acting together, are perpetrating or attempting to perpetrate [a felony] and one of them, in the course of the felony *and in furtherance of the common purpose to commit the felony* kills a human being,

A.2d at 49. In this case, however, the trial court gave the following instruction on felony murder:

> The essential elements of the offense of felony first degree murder while armed, each of which the government must prove beyond a reasonable doubt, are first, that the defendant inflicted an injury or injuries on the deceased from which the deceased died; second, that the defendant did so *while perpetrating or attempting to perpetrate a certain offense.* And the offenses can include robbery or burglary while armed.
>
> Any killing, even if committed without specific intent to kill and even if accidental, is murder in the first degree *if committed in the perpetration or attempt to perpetrate an armed robbery or burglary in the first degree ... while armed.* [Emphasis added.]

After this instruction was given and the jury began its deliberations, one of the jurors sent a note to the court:

> Regarding aiding and abetting: to be found guilty, is it necessary for the aider and abettor to have had the same intent as the person who commits the offense—*i.e.,* murder?
>
> For example, if the aider believes that only a robbery will be committed, but the principal offender commits murder, can the aider be found guilty of aiding and abetting murder?

The court brought the jury back into the courtroom and explained accomplice liability for felony murder as follows:

> [T]he intent which the Government must prove beyond a reasonable doubt, with respect to a defendant charged as an aider and [abettor], is the defendant's specific intent to commit the underlying felony, be it armed robbery, or armed burglary in the first degree; or the defendant's knowledge at the time of the offense that the principal offender had the specific intent to commit the underlying offense.

> both the person who committed the killing *and the person or person who aided and abetted in the felony* are guilty of murder in the first degree. [Emphasis added].

It is not necessary with regard to armed felony murder that the Government prove that either the principal offender or the aider and abettor had the specific intent to kill, or to murder.

 In *Butler v. United States, supra,* we said that when the government seeks to convict an aider and abettor of felony murder, the court must give an appropriate "furtherance" instruction. 614 A.2d at 886–887. It is obvious from the passage we have quoted that the court's charge to the jury did not contain such "furtherance" language. However, when confronted with a similar instruction in *Christian v. United States, supra,* we said:

> In our view, the court should have included the phrase "in furtherance of the common purpose to commit the felony" in its instruction. That language would have better focused the jurors' attention on the requirement that the killing be causally related to the underlying felony.
>
> It is well-settled, however, that the failure of the trial court to give a requested instruction is not reversible error if the instructions actually given inform the jury of the applicable legal principles.

\* \* \* \* \* \*

> We conclude that the failure of the trial court to instruct the jury that the slayings must have been committed "in furtherance" of the burglary or robberies was not prejudicial error. The evidence in this case was such that it would be irrational to suggest that the jury might have found the murders to be unforeseeable or spontaneous.

394 A.2d at 49–50 (citations omitted). Here, as in *Christian,* the court's instructions as a whole adequately conveyed the "furtherance" requirement by "inform[ing] the jury that the connection between the felony and homicide must be more than a coincidence of time and place." *Id.* at 49. Moreover, "[n]othing in this record suggests that [appellant was] precluded from arguing that the killings

*See Butler v. United States, supra,* 614 A.2d at 886 n. 20.

were beyond the scope of, and foreign to, the burglary...." *Id.* at 49–50.

In these circumstances, we conclude that the trial court's instructional omission was not "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts, supra,* 362 A.2d at 709. Accordingly, we find no plain error.

## VI

Chin contends that the trial court erred in refusing to impose sanctions against the government at trial for what he says was a violation of the Jencks Act, 18 U.S.C. § 3500 (1994).[31] The alleged violation resulted from the government's failure to preserve the notes of the officers who interviewed the surviving victims.

At a pre-trial hearing on this issue, Detective Ruben Sanchez–Serrano testified that he videotaped an interview with Christine Brown on February 26, 1988, just a few days after the shootings. Before starting the videotape, the detective and Brown discussed what she would say, and Sanchez–Serrano took preliminary notes. He did not take down exactly what she said, word for word;

instead, he "just tried to get topics or headings, subjects that she would be talking about [on the videotape]," so that they could be addressed "in chronological order." The videotaped interview was conducted immediately thereafter. There were no matters discussed in the pre-taping interview that were not also covered in the videotape. Sanchez–Serrano gave both his handwritten notes and the videotaped interview to Detective Ronald Taylor. The notes were later lost, but both the videotape and a transcript of the tape were disclosed to the defense.

Detective Taylor, the lead investigator, testified that he was assigned to this case in the year preceding his retirement. Just after he went on an extended period of leave, the Homicide Branch rearranged its offices and files without his knowledge.[32] The notes of the interviews he conducted with Christine Brown and Carmetta Dean, which he originally kept in his desk and his files, were later lost during the Branch's reorganization. However, Taylor testified that after each interview and photographic identification procedure, he copied his notes onto police reports, and that these reports were provided to the defense.[33]

---

**31.** Under the Jencks Act, a party is required to produce at trial any "statement" by a government witness. In pertinent part, the Act defines a "statement" as "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement...." 18 U.S.C. § 3500(e)(2).

**32.** Captain William Ritchie, commander of the Homicide Branch, testified that twenty-eight new officers joined the Homicide Branch between February 1988 (when the shootings occurred) and November 1989 (when the trial began). This increase in personnel led to a severe shortage of file and desk space, requiring officers to share desks. Consequently, Detective Taylor's belongings were taken out of his desk while he was on leave and placed in boxes, which were then stored in a rear file room. Though Taylor's files were not kept in locked filing cabinets, the file room was not accessible to the general public. Captain Ritchie admitted that there is a police department general order requiring that potentially discoverable material be preserved in a secure file cabinet. Ritchie explained that some of Homicide's file cabinets were not locked because keys had been lost in past years and some of the locks on the file cabinets were therefore broken. It was impractical, he said, to keep

the files locked at all times because the detectives needed twenty-four hour access to them.

**33.** The parties and the court assumed that Taylor took notes in connection with each of his interviews with Dean and Brown. Taylor's testimony, however, suggests to the contrary, and Dean testified at trial that Taylor did not take notes when he interviewed her. Brown could not recall whether Taylor took notes while talking to her.

Detective Taylor did take notes during a videotaped interview with Dean on February 21, the morning after the shooting. He may also have taken notes when he interviewed Brown in the hospital on February 21 and 22. On February 28 Detective Taylor went to New York and showed Dean a group of photographs, from which she selected a picture of Chin. Dean then wrote "This is Marlon, the one that shot me" on the back of Chin's photograph. Both the photograph and Dean's notation were made available to the defense. The detective conducted a similar procedure with Brown on the following day in Washington. Again, these photographs were made available to the defense, though any notes that Taylor may have taken during these meetings with Brown were subsequently lost.

At the conclusion of the hearing, Chin's motion to exclude the testimony of Brown and Dean was denied. The court found that there was no negligence, let alone gross negligence, on the part of Detective Sanchez–Serrano. The court was more troubled, however, by Detective Taylor's conduct. While finding that the detective was negligent, the court did not view his actions as grossly negligent in light of the "de minimis" consequences that resulted. This determination was based on several facts: (1) the missing notes were relatively unimportant because of the extensive videotape evidence, which served as a substitute for the notes; (2) substantial efforts were made by the police to find the notes; (3) Taylor gave very detailed testimony about the matters that were transcribed in the notes; and (4) although somewhat haphazard, Detective Taylor did have a system for keeping his notes, and after taking his leave of absence, he was not on notice that the homicide office would be moved. The court then concluded:

So, however serious the government's conduct in not preserving these notes—and I think it is a serious degree of negligence that has been shown here—I cannot conclude that the importance of these notes is such that the Court should impose the sanction of excluding this witness' testimony.[34]

■ At the outset we note our agreement with the trial court that Detective Sanchez–Serrano's notes were not covered by the Jencks Act.[35] *See Simms v. United States,* 634 A.2d 442, 447 n. 3 (D.C.1993) (police officer's notes were not "statements" under the Jencks Act because they "appear[ed] to be selective notations from the interview, rather than a continuous narrative recording"); *Coleman v. United States,* 515 A.2d 439, 447 (D.C.1986) (trial court reasonably found that police officer's written summary of witness statement, written from memory two days after interview, was not producible under the Jencks Act), *cert. denied,* 481 U.S.

1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987); *(Calvin) Moore v. United States,* 353 A.2d 16, 18 (D.C.1976) (to be covered by the Jencks Act, police officer's notes "must be a continuous, narrative recording rather than mere selective notations or excerpts from the oral statements"). The detective testified that he simply wrote down "subjects that she would be talking about" in preparation for his videotaped interview of Ms. Brown, and no other testimony suggested that the notes were any more detailed than that. We hold, accordingly, that Sanchez–Serrano's notes were not Jencks Act statements.

■ Less clear is the status of Detective Taylor's notes. When asked by the court whether he took verbatim notes or merely summarized witnesses' statements, Taylor replied:

It would depend on what the information was. My notes were basically my short—some of the notes are my shorthand on, on some instances. If a person made a specific statement, I would use verbatim information. And some things I put in my own particular shorthand.

Assuming, without deciding, that the detective's notes were producible statements, *see (Carlton) Moore v. United States,* 657 A.2d 1148, 1150 n. 2 (D.C.1995), we reiterate the rule that "the administration of the Jencks Act must be entrusted to the 'good sense and experience' of the trial judges subjected to 'appropriately limited review of appellate courts.'" *United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969) (citation omitted). Although we have frequently complained of "the indifference shown by the government in its failure to preserve discoverable evidence," we have repeatedly and consistently held that the loss of discoverable Jencks Act statements "does not automatically require the imposition of sanctions." *Slye v. United States,* 602 A.2d 135, 138 (D.C.1992) (citations omitted). Instead, when such evidence has been lost or

---

**34.** The court did impose a limited sanction by precluding the government from eliciting testimony about any consistent statements that Dean had made before giving her videotaped statement or before she identified Chin from the photographic array shown to her by Detective Taylor.

**35.** The trial court was "not even prepared to conclude" that Sanchez–Serrano's notes were Jencks material.

destroyed, the trial court must evaluate the totality of the circumstances before deciding what sanctions, if any, to impose. *Montgomery v. United States,* 384 A.2d 655, 662 (D.C. 1978). "Any such decision will be affirmed on appeal unless the appellant demonstrates that the trial court abused its discretion." *(Carlton) Moore, supra,* 657 A.2d at 1150 (citing *Slye,* 602 A.2d at 138). Guided by these principles, we find no abuse of discretion here.

▮ In deciding not to impose sanctions, the trial court carefully and conscientiously weighed each of the factors we have identified in such cases as *United States v. Jackson,* 450 A.2d 419, 426 (D.C.1982), and *Cotton v. United States,* 388 A.2d 865, 870 (D.C. 1978). While not discounting the police department's blameworthiness, the court found that the relative importance of the notes and the degree of prejudice resulting from their loss were minimal because the "information in the missing document[s][was] available from another source." *(Carlton) Moore,* 657 A.2d at 1150; *see Slye,* 602 A.2d at 139; *Bartley v. United States,* 530 A.2d 692, 697 (D.C.1987); *West v. United States,* 599 A.2d 788, 789 n. 1 (D.C.1991) (no prejudice when officer's lost notes were "faithfully transcribed in the police report which was furnished to [defense] counsel").[36] Also significant is the fact that the witnesses' videotaped statements were quite explicit as to the subjects covered in the missing notes, including the identity of their assailants. *See Slye, supra,* 602 A.2d at 139 (victim's description of assailant given to police in a 911 call was of little or no evidentiary value because his identification of defendant at trial was based primarily on victim's past acquaintance with his assailant). Finally, the trial court's determination that Detective Taylor's conduct was not grossly negligent is a finding of fact, which cannot be overturned on appeal unless it is clearly erroneous. *Id.* at 139 (citation

omitted). We find no such error on this record.

We hold, therefore, that the trial court did not abuse its discretion in refusing to impose Jencks Act sanctions for failure to produce the detectives' notes.

## VII

▮ Finally, Chin contends that he was prejudiced by the trial court's refusal to hold a hearing when the court received a note from a juror during deliberations which appeared to express a general apprehensiveness about the jury's safety. Chin believes that the jurors might have based their verdict not upon the evidence, but upon "fears of violence or retaliation." We review the court's ruling for abuse of discretion, *Morris v. United States,* 564 A.2d 746, 748–749 (D.C. 1989), with the understanding that "the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires." *United States v. Thornton,* 1 F.3d 149, 155 (3d Cir.) (citation omitted), *cert. denied,* 510 U.S. 982, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993); *accord, Arizona v. Washington,* 434 U.S. 497, 513–514, 98 S.Ct. 824, 834–35, 54 L.Ed.2d 717 (1978); *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

The jury began its deliberations on a Friday afternoon. Before resuming deliberations on Monday morning after the weekend recess, the jury sent the following note to the trial court: "Your Honor, the jury would appreciate having anonymity. Will this be the case?" The court told the jurors that, in accordance with the standard procedure of the Superior Court, they would not be anonymous, but that they did not have to discuss the case with anyone after returning their verdict. Neither defense counsel objected at the time. After the luncheon recess, howev-

---

**36.** *See also Gresham v. United States,* 654 A.2d 871, 875 (D.C.), *cert. denied,* —— U.S. ——, 116 S.Ct. 155, 133 L.Ed.2d 99 (1995) (no prejudice to defendant when police notes, if they existed at all, were immediately incorporated into typewritten statements, reviewed and signed by the witness, and later disclosed to defense); *Simms v. United States, supra,* 634 A.2d at 447 n. 3 (offi-

cer's alleged notes were, according to the government, incorporated into a summary in the detective's investigative report, which was disclosed to the defense); *Williams v. United States,* 355 A.2d 784, 788–789 (D.C.1976) (failure to produce officer's notes harmless because defense received other comprehensive notes of same witness interview).

er, Chin's counsel moved for an individual *voir dire* of the jurors, arguing that the note might indicate their fear of retaliation, which could affect their ability to render a fair and impartial verdict, and could result in guilty verdicts beyond what the jury would have returned otherwise.[37]

The court gave several reasons for denying counsel's request. First, the concern about improper influence was entirely speculative and unwarranted by the terms of the note itself. Second, the pre-trial *voir dire* was specially designed to "root out" people who could not be fair, given the nature of this particular case.[38] Third, "the jurors had not been informed of the sentences that would attach to each particular offense and would be instructed that they were not to take sentences into account in reaching their verdicts." Finally, "Chin's two-hour delay in making his request made it likely that a *voir dire* would create more problems than it would resolve, possibly prompting jurors to speculate that something had come up that was of concern to the court and that might bear on juror safety." Nevertheless, counsel for Chin renewed his request the following day. The court denied this request "for the same reasons ... articulated earlier," and because, unlike a situation involving influence by external publicity, "a post-verdict *voir dire* in this situation would [not] play any useful role whatsoever."

■■■ Citing *Morton v. United States,* 415 A.2d 800 (D.C.1980), Chin now argues that the trial court was required to conduct a *voir dire* of the jurors to determine the basis for their apprehension. In *Morton* we held that "[i]f it appears from events extraneous to proof in the case ... that a substantial possibility of a coerced verdict exists, neither the trial court nor this court may speculate it away," and a mistrial should be granted.[39] *Id.* at 802. We have also expressed a preference for colloquies with individual jurors when the court makes a threshold finding that the jury has been exposed to potentially prejudicial *outside* influences, such as the media. *See Morris, supra,* 564 A.2d at 748–749 ("the trial court must decide whether the [external] information was potentially prejudicial" and, if so, "whether [the jurors] have been prejudiced by it");[40] *United States v. Williams–Davis,* 319 U.S.App. D.C. 267, 278, 90 F.3d 490, 501 (1996) (adopting three-part test for mid-trial claims of media exposure), *cert. denied,* —— U.S. ——, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997); *LaRouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139 (4th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986).

■■■ In this case the trial court received a jury note that requested anonymity, arguably because one or more jurors were concerned about their safety.[41] However, "[n]othing in this statement intimates that the jurors were exposed to 'extra-record information.'" *United States v. Thornton, supra,* 1 F.3d at 155; *see People v. Williams,* 44 Cal.3d 1127,

---

**37.** Counsel also suggested that the jurors' answers to pre-trial *voir dire* questions about their ability to be fair might have been based on the erroneous assumption that the jury would be anonymous. The court rejected this argument as wholly speculative and contrary to the record, and Chin (represented by new counsel) does not press it on appeal.

**38.** During the *voir dire,* the venire members were told that the case involved charges of first-degree murder with a pistol, as well as a knife attack on an infant. They were also directed to inform the court if there was anything about the nature of the charges that would prevent them from deciding the case fairly.

**39.** Underlying this rule is the principle that "a defendant in a criminal proceeding has the right to a trial by his peers who are free to deliberate and make an independent personal judgment as to guilt." *Morton, supra,* 415 A.2d at 802 (citation omitted); *see also Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (a fundamental element of due process is that a jury in a criminal case must be willing to decide the case solely on the evidence before it).

**40.** We also said in *Morris,* "If it is determined that there is potential prejudice, the court has the discretion to give curative instructions, seat alternate jurors, declare a mistrial, or take other corrective measures." 564 A.2d at 749.

**41.** We are not fully convinced that the note necessarily meant the jurors were apprehensive about their safety. It could just as likely have "referred to protection from the media, rather than protection from danger." *United States v. Sanders,* 962 F.2d 660, 672 (7th Cir.), *cert. denied,* 506 U.S. 892, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992).

1155–1156, 751 P.2d 901, 920, 245 Cal.Rptr. 635, 654 (while "[e]vidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby ... [i]t is not clear, however, that such a rule applies to the jurors' perceptions of the defendant"), *cert. denied,* 488 U.S. 975, 109 S.Ct. 514, 102 L.Ed.2d 549 (1988). Moreover, mere "[d]iscussions among the jurors as to their fear of the defendants are not inappropriate, so long as such discussions do not lead them to form an opinion of the defendants' guilt or innocence of the offenses charged." *United States v. Watchmaker,* 761 F.2d 1459, 1466 (11th Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 880, 88 L.Ed.2d 917 (1986).

■ "In this context, the [trial] court's discretion concerning whether a colloquy should be held is especially broad," because a trial judge "is usually well aware of the ambience surrounding a criminal trial and the potential for juror apprehensions." *Thornton,* 1 F.3d at 155; *see Grooms v. Wainwright,* 610 F.2d 344, 347 (5th Cir.), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980). Thus, in deciding whether to question jurors, the trial court must be especially sensitive to the danger of making the situation worse:

> [T]he court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct. We, as an appellate tribunal, are in a poor position to evaluate these competing considerations; we have only an insentient record before us.

*United States v. Chiantese,* 582 F.2d 974, 980 (5th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979); *see also United States v. McAnderson,* 914 F.2d 934, 944 (7th Cir.1990) ("[a]ny discussion of the fear which caused the removal of the jurors risked conjuring up in the remaining jurors some element of that fear").

■ Here as in *Thornton,* the trial court weighed these opposing interests and concluded that questioning the jurors would do more harm than good. "Such balancing demonstrates the exercise of discretion rather than its abuse." *Thornton,* 1 F.3d at 156. We note, moreover, that the government's evidence was very strong and that Chin presented virtually no defense, which leads us to conclude that the verdict was properly based on the evidence rather than on the jurors' supposed fears about their safety. Viewing the record as a whole, we can find no abuse of discretion in the manner in which the court dealt with the juror's note.

## VIII

In sum, we reject all of appellants' substantive arguments. We remand the case to allow the trial court to vacate those convictions that merge, and to resentence both appellants. In all other respects the judgments of conviction are affirmed.

*Affirmed on the merits, remanded for resentencing.*