Louis A. McCOY, Jr., Appellant,

v.

UNITED STATES, Appellee.

Troy D. Burner, Appellant,

v.

United States, Appellee.

Nathaniel Harrod, Appellant,

v.

United States, Appellee.

Francois D. Bracmort, Appellant,

v.

United States, Appellee.

Nos. 96–CO–660, 94–CF–983, 94–CF–1009, 96–CO–710, 94–CF–1014, 96–CO–569 and 94–CF–1275.

District of Columbia Court of Appeals.

Argued Jan. 12, 1999.
Decided Sept. 28, 2000.

Paul J. Zidlicky and Jeffrey T. Green, Washington, DC, appointed by this court, for appellant McCoy.

Susan Pleasant, appointed by this court, for appellant Burner.

Peter H. Meyers, Washington, DC, appointed by this court, for appellant Harrod.

M. Elizabeth Kent, Washington, DC, appointed by this court, for appellant Bracmort.

Matthew L. Levine, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Kenneth C. Kohl, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and REID, Associate Judge, and KERN, Senior Judge.

WAGNER, Chief Judge:

Appellants Louis A. McCoy, Jr., Troy D. Burner, Nathaniel Harrod, and Francois D. Bracmort, were convicted following a jury trial of first-degree premeditated murder while armed of Michael Wilson (D.C.Code §§ 22–2401, –3202 (1989)), carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a)), and possession of a firearm during a crime of violence (PFCV) (D.C.Code § 22–3204(b)). McCoy, Burner and Harrod were charged with and convicted of an additional count of assault with intent to kill while armed (AWIK W/A) of Joseph "Go–Go" Kinard (D.C.Code §§ 22–501, –3202), which occurred the same night that Wilson was shot. Appellants Burner, Harrod, and McCoy argue for reversal on the principal grounds that the trial court erred in: (1) precluding them from introducing evidence that the government's key witness, Antoine Payton, committed the offenses; (2) admitting post-shooting hearsay statements of appellant Bracmort; (3) denying their respective motions for severance; and (4) denying post-conviction relief based upon the government's failure to disclose exculpatory evidence. Bracmort's principal challenges are that the trial court erred in: (1) admitting into evidence letters he wrote to Payton which tended to "depict him as a man of bad character, guilty by association with unsavory bandits, with a propensity to commit other crimes"; and (2) allowing improper, prejudicial rebuttal argument by the prosecutor. We conclude that none of these claimed errors require reversal. However, we reverse the convictions of Burner and Bracmort for CPWL for evidentiary insufficiency on an aiding and abetting theory, and remand the case to the trial court with instructions to vacate all appellants' convictions for PFCV, which the government concedes was not a crime at the time relevant hereto.

## I. Factual Background

The case arose out of a shooting in the 600 block of Fifteenth Street, N.E. which occurred on April 21, 1990 at about 9:00 p.m. Two men wearing dark clothing and dark "hoodies" or "ski masks" chased down and shot at Michael Wilson and Joseph Kinard. Michael Wilson sustained gunshot wounds from which he later died. Wilson's friend, Gerri Shaw, along with her brother, Eric, and another friend had been talking with Wilson just prior to the shooting before returning to Ms. Shaw's car. As she drove away, Ms. Shaw heard the sound of gunfire from automatic weapons. She immediately stopped the car, looked through the rear view mirror, and spotted two men chasing after and shooting at Wilson and Kinard.[1] Shaw noticed that one of the gunmen chased Kinard across the street, but the gunman then resumed his chase after Wilson.[2] While running, Wilson fell and the two gunmen then stood over him, and from a distance of four to five feet, fired approximately fifty shots from automatic weapons. Ms. Shaw testified that she could not see the faces of the assailants because of the hoodies or ski masks covering them.

---

1. At trial, Shaw's brother, Eric, who witnessed the shooting also, testified along the same lines as his sister. Eric Shaw further testified that one of the gunmen was taller and slimmer than the other.

2. Kinard testified that within a few seconds after Shaw's car pulled off, he heard gunshots and saw someone chasing Wilson toward the Pentacle apartments. Kinard ran across the street and ducked behind a car. While he heard the gunfire, he was unable to see who the gunmen were or how many.

The government called as one of its key witnesses Antoine "Gangster or Short Dog" Payton.[3] Payton testified that he had known Bracmort, who had lived around 16th and Benning Road, Northeast, for approximately six years.[4] Payton testified that he met Harrod and McCoy through Bracmort in December 1989, but he had known Burner since 1987 and had a closer relationship with him than the others. In April 1990, Payton was living in Bracmort's apartment in Maryland, where he had lived since 1990. Burner, Harrod and McCoy also lived there at this time.

According to Payton's testimony, approximately two to three days prior to the shooting, Burner, Harrod, McCoy and Bracmort were in the living room of the apartment discussing plans to murder Wilson because Bracmort had heard that Wilson was planning to rob him.[5] Payton said that they all agreed "in principle" to participate in the shooting. They knew that Wilson was often in the area of 15th Street, Northeast, and they developed a plan to approach him in a "T"-like formation, which required three to four people for execution. The plan called for Bracmort to drive his car and meet McCoy, Harrod and Burner after the shooting.

About twenty minutes before the planned shooting, Payton met Bracmort about a block from 15th Street. Payton testified that Bracmort informed him that he was waiting for Burner, McCoy and Harrod to ambush and kill Wilson. Shortly thereafter, while driving on 15th Street, Payton spotted Wilson standing near Miner Elementary School. Payton testified that he saw Burner standing on the corner of 15th and Gales Streets, wearing a hooded sweatshirt, but his face was not covered at the time, and he did not have his gun drawn.

At approximately 9:00 p.m., Payton heard gunshots and observed one gunman chasing Wilson, and another, chasing another man, later identified as Joseph Kinard. Payton also saw someone, whom he believed to be McCoy, chasing Wilson, and he saw Harrod chasing Kinard.[6] Both of the gunmen were firing automatic weapons. Payton then saw Harrod join McCoy as they both stood over Wilson firing bullets into Wilson. About this time, Payton saw Burner, who was holding a gun, put his hood over his head to obscure his face and move away from the scene. Payton did not see Burner fire his weapon. Payton testified that he did not get involved in the shooting because he had recently been in trouble, was staying with his mother, and he was babysitting his one-year old brother, who was in the car with him.

Payton testified that he went back to the apartment about 11:00 p.m. that evening, and Bracmort, Burner, Harrod and McCoy

---

**3.** At the time of trial, Payton was serving a federal sentence, and awaiting sentencing for second-degree murder to which he had entered a guilty plea for the murder of Samuel Glenn. Pursuant to the plea agreement, Payton testified in this case. The jury was informed of Payton's prior convictions for (1) armed second-degree murder in March 1993, for which he was facing a possible sentence of fifteen years to life; (2) possession with intent to distribute cocaine, for which he had been sentenced to 96 months' incarceration; (3) cocaine distribution in Maryland in 1989, for which he was facing a possible sentence of twenty years for a probation violation; (4) attempted distribution of cocaine in Superior Court, for which he had been sentenced to four to twelve years; and (5) misdemeanor bail jumping in 1990, for which he had been sentenced to 150 days.

**4.** This area includes the Pentacle and Azeeze Bates apartment complexes.

**5.** Payton testified that he had known Wilson, who was older than appellants, his entire life and had seen Wilson at least once a week in early 1990. Payton further testified that during this period, Wilson had been "shaking people down" by either asking or demanding money from them.

**6.** Payton was not certain who the gunmen were because they were wearing dark, black clothing and hooded sweatshirts which covered their faces. According to Payton, it was later that evening when Payton learned that it was in fact McCoy who chased Wilson and Harrod who chased Kinard.

were all there. He said that they talked about how Harrod and McCoy had carried out the plan to murder Wilson. Payton testified that McCoy and Harrod accused Burner of being a coward for failing to fulfill his part of the plan. Burner responded that he did not do anything because he feared getting caught in the cross-fire. Bracmort "recommended that [appellants] not do a lot of talking about what happened," and they all agreed. The conversation ended with Harrod and Burner getting into an altercation which led to Burner moving out.

The government also called Antonio "Hub" Johnson, a long-time friend of Bracmort and Wilson.[7] Johnson testified that Wilson and Bracmort had argued sometime in April 1990. As a result of this argument, Bracmort believed that Wilson might try to rob him and told Johnson that he would try to take some preemptive action. In addition, Bracmort told Johnson that he "was going to get something done to [Wilson]." On the afternoon of the shooting, Johnson was visiting Bracmort. Johnson said that while there, he saw Burner, Harrod and McCoy getting dressed in black "hoodies" and black jeans, although he did not see anyone with guns. He testified that Bracmort informed him that they were "getting ready to do something," but he did not say exactly what.

Later that day, while visiting a friend who lived in one of the Pentacle apartments, Johnson saw Wilson walking with two other individuals towards 15th Street. Approximately ten to fifteen minutes later, Bracmort arrived at the apartment.[8] Some fifteen minutes after Bracmort's arrival, they heard gunshots. Bracmort and Johnson ran outside where Johnson saw Wilson lying wounded on the ground.

Johnson testified that he saw Bracmort walking off in the direction of his car.

Johnson testified that about a week after the shooting, he was at Bracmort's apartment and that Bracmort said that he had something to tell him. However, before Bracmort could say anything further, McCoy pulled Bracmort aside, and Bracmort told Johnson that he would talk to him later. A week later, Bracmort told Johnson that McCoy had told him not to talk to Johnson because McCoy was concerned that Johnson might say something to his buddy, Dirk Wright, who could not keep a secret. Bracmort then told Johnson how he, McCoy, Harrod and Burner had shot Wilson. Johnson testified that Bracmort told him that McCoy had a "Glock," Harrod a "nine," and Burner a ".380." Johnson further testified that Bracmort told him that Burner said he did not fire his gun because it had gotten jammed, but that Burner really "didn't want to do it anyway."

While investigating the crime scene that night, Officer Michael Gabor recovered twelve shell casings, three copper-jacketed bullets, and two bullet fragments. At trial, Cleon Mauer, a qualified expert in firearms identification, testified that the bullets and shell casings recovered at the scene were all fired from nine-millimeter, semi-automatic weapons. Mr. Mauer further testified that two of the bullets and fragments were fired by a single weapon, but the shell casings were fired by two different semi-automatic pistols, including a Glock. Mr. Mauer was unable to identify three of the bullets.

## II. *Exclusion of Third–Party Culpability Evidence*

Appellants McCoy, Burner and Harrod argue that the trial court erred in prohibit-

---

**7.** Johnson testified pursuant to a written plea agreement which provided that the government would dismiss a possession with intent to distribute cocaine charge pending against him in the Superior Court and would file a letter informing the court that he had provided "substantial assistance" to the govern-

ment, provided Johnson complied with the agreement. At the time of trial, Johnson was participating in an informal witness protection program.

**8.** Johnson saw Bracmort's brown Corolla in the parking lot of the Pentacle apartments.

ing them from introducing evidence that it was the witness, Antoine Payton, who murdered Michael Wilson. They contend that in excluding this evidence, the trial court applied an erroneous standard for admissibility, which was rejected in *Winfield v. United States*, 676 A.2d 1 (D.C.1996), subsequent to their trial. Exclusion of this evidence, appellants argue, left the jury with the false impression that they lacked evidentiary support for their defense which included a claim that Payton shot or was responsible for Wilson's shooting. The government argues that the trial court did not abuse its discretion in limiting cross-examination and argument concerning Payton's alleged involvement in Wilson's murder and Payton's murder of Samuel Glenn, which appellants contended was a similar crime. It is the government's position that in spite of the trial court's ruling, appellants suffered no prejudice because the court permitted them to introduce extensive evidence and argument in support of their theory that Payton participated in Wilson's murder, and therefore, the error, if any, was harmless beyond a reasonable doubt. Before addressing the parties' legal arguments, we recount briefly the factual and procedural context in which this issue arose at trial.

A. *Factual and Procedural Background of Third–Party Culpability Issue*

During a pre-trial conference on appellants' motions to sever, counsel for McCoy, Burner and Harrod sought permission from the trial court to mention in opening statement and to elicit during cross-examination, facts surrounding Payton's murder of Samuel Glenn. Payton had entered a plea of guilty to second-degree murder in the Glenn case. Appellants sought to use

the evidence for impeachment purposes and as substantive evidence of Payton's responsibility for Wilson's murder. The trial court denied the request, concluding that appellants had proffered no evidence in support of their third-party culpability theory. On the morning the trial commenced, counsel for Burner filed a motion for reconsideration of the court's ruling, which McCoy and Harrod joined. In the reconsideration motion, appellants proffered that they sought to elicit from Payton on cross-examination and to argue before the jury that: (1) Payton knew in advance about the plan to kill Wilson and when the shooting was to take place, and he was present at the scene of the murder; (2) Payton was arrested in possession of firearms on March 12, 1990 [9] and again on April 2, 1990, less than one month before the shooting; (3) Bracmort wrote Payton a letter in April 1992 in which he complained about Payton talking and warned him to keep his mouth shut, a threat the government contends refers to Payton's knowledge about the Wilson murder; (4) upon solicitation by Bracmort, Payton participated in a similar murder (of Glenn) three months earlier, near the same location, with the same type of handgun, with assailants wearing similar clothing (hoodies and/or masks), and using the same *modus operandi* (running up on the victim on the street and firing before he could react), and getaway route and driver (*i.e.*, Bracmort); and, (5) Bracmort provided Payton with the same inducements for both crimes (*i.e.*, money, a car, and a place to live with Bracmort). The trial court denied the motion, concluding that the proffered evidence would not lead a reasonable person to conclude that Payton committed the Wilson murder.[10]

9. Bracmort and Burner were with Antoine Payton when he was arrested.

10. In its ruling, the trial court stated:

I still stick with the statement I made on Friday because ... there's not one bit of proffered evidence that would lead me to conclude that the Defendants have a good

faith basis for accusing Mr. P[a]yton of committing this crime.

I say this even after reading the Defendant's proffer contained on page five, six and seven of their memorandum.... I say this even after reading that because that entire list doesn't contain anything that would lead anybody, any reasonable per-

### B. *Legal Standard*

██ Evidence that someone else committed the offense for which a defendant is on trial is admissible under the same standard of relevance which governs the admissibility of other evidence.[11] *See Winfield, supra,* 676 A.2d at 4. In the *en banc* opinion in *Winfield,* this court clarified the standard governing admissibility of third-party culpability evidence, adopting the formulation from *Johnson v. United States,* 552 A.2d 513 (D.C.1989), which requires only "proof of facts or circumstances which tend to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense." *Id.* (quoting *Johnson,* 552 A.2d at 516) (internal quotation marks omitted) (emphasis added). Relevance in this context, "means what it generally does in the criminal context, requiring a 'link, connection or nexus between the proffered evidence and the crime at issue.'" *Id.* (quoting *Johnson,* 552 A.2d at 516). To the extent that prior precedents, (*e.g., Brown v. United States,* 409 A.2d 1093 (D.C.1979) and *Beale v. United States,* 465 A.2d 796 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984)) impose a standard of admissibility more exacting than that enunciated in *Winfield,* this court disavowed them. *Winfield,* 676 A.2d at 5. Under what is sometimes referred to as the *Brown–Beale* standard, "'before evidence of the guilt of another can be deemed relevant and thereby admissible, the evidence must *clearly link* that other person to the commission of the crime.'" *Winfield,* 676 A.2d at 2 (quoting *Brown, supra,* 409 A.2d at 1097) (emphasis in orig-

inal). In *Winfield,* this court determined that the "clearly linked" formulation was "unhelpful and should be discarded from our lexicon of terms governing the admissibility of third-party perpetrator evidence." *Id.* at 3. Appellants contend that the trial court set the bar too high for admissibility, by applying the *Brown–Beale* standard.

██ Under the *Johnson* standard, adopted in *Winfield,* the focus remains "not on the third party's guilt or innocence, but on 'the effect the evidence has upon the defendant's culpability,' and in this regard it 'need only *tend* to create a reasonable doubt that the defendant committed the offense.'" *Winfield, supra,* 676 A.2d at 4 (quoting *Johnson, supra,* 552 A.2d at 517) (emphasis in original). However, merely presenting evidence of another's motive is insufficient to meet the test, where unattended by "proof that the party had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts." *Id.* at 5 (citations omitted). Finally, the trial court's determination of whether to admit such evidence should not be disturbed absent a showing of abuse of discretion. *Id.*

### C. *Analysis of Third–Party Culpability Question*

The aggregation of circumstances set forth in appellants' motion in the trial court and outlined above, strongly indicate that the standard for admissibility of the evidence under *Winfield* was met. Briefly summarized, these circumstances include that: Payton was present when Bracmort

---

son, to conclude that Mr. P[a]yton committed the crime at issue.

Indeed, the list contains rather anomalous absurdities such as Mr. P[a]yton is on the scene. Well, I dare say there are probably a thousand other people on the scene. That doesn't mean they can be accused of murder either. I just use that as an example.

Anyway, I adopt completely the statement I made on Friday as being if I hadn't have said it on Friday I'd say it today.

11. Generally, "[r]elevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) (citing *United States v. Carter,* 173 U.S.App. D.C. 54, 73, 522 F.2d 666, 685 (1975)).

enlisted him and the other appellants in a plan to kill Wilson, and Payton was willing to participate; Payton was at the crime scene when Wilson was shot, albeit with an explanation;[12] Payton had participated in a similar murder at the behest of Bracmort shortly before the Wilson murder; Payton had been arrested for having weapons in his possession shortly before the crime, one of which was similar to the one from which shots were fired the night that Wilson was killed. It was Payton whom Bracmort accused of snitching and warned not to talk about the crime after it was committed. These circumstances tend to show that Payton had the motive, opportunity, and means to commit the Wilson homicide. Such facts are probative of whether there is a reasonable possibility that Payton was involved in the homicide. *See Winfield, supra,* 676 A.2d at 5 (motivation attended by proof of a practical opportunity to commit the offense supports admissibility of third-party culpability evidence); *see also Marshall v. United States,* 623 A.2d 551, 554 (D.C.1992) (Prior possession of a pistol, the physical means for committing the charged offense, is probative of guilt of the offense.). Thus, appellants proffered facts which would tend to indicate some reasonable possibility that it was Payton and Bracmort who killed Wilson, particularly where there were no witnesses to the actual shooting, other than Payton, who could identify McCoy, Burner and Harrod as the assailants.

The government argues that the trial court's ruling is correct even applying the *Winfield* standard because appellants' proffer failed to undermine the culpability of Burner, Harrod or McCoy. This, the government contends, is a fundamental requisite for admissibility of third-party culpability evidence. It is correct that the standard for admissibility of third-party culpability evidence "is not on the third party's guilt or innocence, but on 'the ef-

fect the evidence has upon the defendant's culpability,' and in this regard it 'need only *tend* to create a reasonable doubt that the defendant committed the offense.'" *Winfield, supra,* 676 A.2d at 4 (quoting *Johnson, supra,* 552 A.2d at 517) (emphasis in original). Thus, the government's argument is that even if the proffered evidence implicates Payton in the crime, it would not be admissible because it does not tend to create a reasonable doubt as to the guilt of the three appellants because: (1) there were three assailants on the scene, all dressed in black and wearing "hoodies," when two of them shot at the victims; and (2) Bracmort was not on the scene at the time of the shooting nor attired like the shooters. The government contends that the proffered evidence would show at best that Payton was there to assist appellants in committing the crime, but it would not contradict Payton's testimony in any way material to appellants' guilt. Appellants respond that evidence that it was Payton who was one of the three assailants would have shown this key witness' bias and lead the jury to doubt his critical testimony.

 A witness' bias is always a proper subject of cross-examination. *Scull v. United States,* 564 A.2d 1161, 1165 (D.C. 1989) (citations omitted). "Accordingly, evidence that tends to show bias, even if extrinsic to issues raised on direct examination, should be admitted." *Id.* (citing *United States v. Abel,* 469 U.S. 45, 51, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) and *In re C.B.N.,* 499 A.2d 1215, 1218 (D.C. 1985)). Unquestionably, evidence that the testimony of the key eyewitness to the shooting might be motivated by his effort to cover up his own involvement in the shooting, and perhaps to downplay the culpability of his partner in criminal activity, is highly relevant to the jury's assessment of the witness' credibility. A reasonable juror, aware of this evidence, might have rejected Payton's identification of Burner, Harrod or McCoy as the perpetrators.

12. According to Payton, he did not participate in the murder because he had a child in the car for whom he was babysitting, although he got out of the car to observe the shooting.

Indeed, the jury could reasonably infer that Payton, who had agreed to participate and had admittedly committed a similar homicide for the same reason, was one of the three perpetrators on the scene, there to block the victim's escape route, consistent with the conspirators' plan. Thus, this evidence may be considered relevant to the issue of whether a reasonable doubt existed as to appellants' guilt in this case.

■■■■ The government argues that the underpinnings for appellants' theory that the Glenn homicide was similar to the Wilson homicide is flawed, and therefore the trial court had wide latitude in determining to exclude evidence of the earlier shooting. Specifically, the government contends that the circumstances of these two homicides were not so unique as to mark them as signature crimes. A nighttime shooting in this particular neighborhood by individuals who covered their faces, chased down their victims, fired multiple shots and escaped through a nearby parking lot, the government argues, is not unique in this city. We are not persuaded that the similarities between the Glenn and Wilson homicides are insufficient for admission of the evidence in this context. Significant to this determination is that evidence was proffered that Bracmort solicited Payton to commit the Glenn and Wilson homicides because each one was allegedly planning to rob Bracmort, and admittedly Payton carried out the first request. When these factors are considered in combination with all the others, it is not unreasonable to infer that the person who admittedly carried out the first planned murder, may well be a person who carried out the second, particularly given Payton's knowledge of, and presence at, the second crime scene. "[F]or admissibility the crimes need not be identical if 'the totality of the circumstances demonstrates a reasonable probability that the same man attacked both complainants.'" *New-*

*man v. United States,* 705 A.2d 246, 257 (D.C.1997) (quoting *Cox v. United States,* 498 A.2d 231, 238 (D.C.1985)). The totality of the circumstances here provides a basis for admission of the evidence concerning the plan and execution of the prior homicide. Finally, even where the question of admissibility of third-party culpability evidence is a close one, we have held that it must be resolved in favor of admission of the evidence. *Newman,* 705 A.2d at 256 (citing *Winfield, supra,* 676 A.2d at 6). Therefore, on this record, we conclude that it would be error to preclude appellants from seeking to elicit evidence that Payton was one of the two shooters.[13] The question remaining on this issue is whether the error was of a magnitude to require reversal.

### D. Harmless Error Analysis

■■■■ This type of error "reaches constitutional proportions if the trial court has failed to permit 'sufficient cross-examination to comport with the requirements of the Sixth Amendment.'" *Scull, supra,* 564 A.2d at 1166 (quoting *Springer v. United States,* 388 A.2d 846, 856 (D.C.1978)). Thus, where "the trial court's evidentiary ruling wholly deprive[s] the defendant of any opportunity to cross-examine a witness or present evidence concerning bias or a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt, applying the test set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." *Clark v. United States,* 639 A.2d 76, 81 (D.C.1993) (citations and footnote omitted). Under that test, "it must be clear beyond a reasonable doubt '(1) that the defendant would have been convicted without the witness' testimony, or (2) that the restricted line of inquiry would not have weakened the impact of the witness' testimony.'" *Scull,* 564 A.2d at 1166 (quoting *Springer,* 388

---

**13.** The evidence at trial was undisputed that one of the three hooded assailants did not fire at Wilson and Kinard.

A.2d at 856) (other citations omitted). The government argues that exclusion of the evidence was harmless beyond a reasonable doubt because: (1) appellants were able to put before the jury evidence of Payton's role in the Glenn murder and complicity in the Wilson murder; (2) the government's case was quite strong; and (3) the excluded evidence was not "central" to swaying the jury's verdict.

In spite of the trial court's ruling, Burner, Harrod and McCoy were permitted to present evidence tending to tie Payton to the two homicides. Specifically, in questioning Payton, Harrod's counsel elicited from Payton on cross-examination that he had shot Samuel Glenn more than one time with a semiautomatic gun, three months prior to the Wilson murder, and in the same location. He also questioned Payton about whether he was carrying a gun on the night of the Wilson shooting.[14] In cross-examination, McCoy's counsel got Payton to acknowledge that the Wilson shooting was in the same general area of the Glenn murder, which Payton again admitted committing; that the two occurred about three months apart; that Payton had run up on Glenn just as he claimed that the perpetrators did on Wilson; that he paged Bracmort, who called him back just before the shooting was to occur; that he and Bracmort talked at Hechinger Mall twenty minutes before the shooting occurred; and that he was at the scene of the crime in time to witness the Wilson killing, which he had previously expressed his willingness to commit. Burner's attorney also questioned Payton along these same lines. In cross-examination by Burner's counsel, Payton admitted that he had "agreed in principle" to assist in the Wilson murder and that when they made the plans to kill Wilson, he had the experience in committing such a crime.[15]

Appellants were allowed in closing arguments to suggest a connection between the Glenn and Wilson homicides and that Payton participated in the Wilson homicide. Burner's counsel argued to the jury that Payton planned and executed both shootings, stating:

> If there was any planning, we know who the planner was. It was Antoine Payton. He's the pro. He's the one that two months earlier did the same thing in the same way.
>
> A. Right.
> Q. Now, isn't it . . . basically a block and a half away?
> A. Right.
> Q. Okay. And—when you murdered Samuel Glenn you used an automatic gun, right?
> A. Right.
> Q. And you were dressed in all black too, right?
> A. No.

The prosecutor then objected to this line of questioning as being within the scope of the trial court's prior order, and the trial court sustained the objection.

---

14. The following excerpts from Harrod's counsel's cross-examination of Payton are illustrative:

> Q. Mr. Payton, you murdered someone, isn't that correct?
> A. Yes.
> Q. Okay. And you murdered someone three weeks after you got out of jail, right, for distributing drugs in Prince Frederick County, isn't that correct?
> A. Right.
> * * * *
> Q. Okay. You shot the person more than one time, isn't that right?
> A. Right.
> Q. And you used a semiautomatic gun on that day in January of '90, isn't that correct?
> A. Right.
> * * * *
> Q. Now, let's get back to the murder on Isherwood Street, okay, that is the murder in January of 1990 of Samuel Glenn. Now, didn't that murder in fact occur, like, right in the same neighborhood of the six hundred block of 15 th Street, northeast?

15. Bracmort's counsel also questioned Payton about using a gun to commit other crimes for which he had been convicted. This cross-examination was also sought to draw a connection between the Wilson and Glenn shootings. However, while admitting the Glenn murder, Payton denied participating in the Wilson shooting.

Harrod's counsel also reminded the jury that Payton had committed a murder in the same area, that he was on the scene the night of the Wilson homicide and that his explanation for his own presence was false and implausible.[16] In a similar vein, McCoy's counsel argued:

> [Payton] ... had committed a murder about a block and a half from where this shooting in this case happened in 1990, the same year that this shooting happened.
>
> ... And Mr. Payton was familiar with that area. He had killed someone in that same area in the same year that this shooting happened. And that's why Detective Leadmon probably chose him to—chose to talk with him about it.
>
> And what happened at this point? ... not long after Detective Leadmon met with ... Payton, ... Anthony Payton decided to enter into a cooperation agreement with the Government because he felt that it would help him to get out of jail.

> \* \* \* \*

> ... Now Mr. Payton, although he claimed he was friends with Michael Wilson, told you that he just happened to run into Francois Bracmort on the day that this shooting happened. Even though ... he just happened to be moved out of that apartment in Maryland with all of the Defendants right before the shooting went down ...
>
> But, nevertheless, he just happened to run into Francois Bracmort ... about thirty minutes or twenty minutes ...

before the shooting. He just happened to have a conversation with Mr. Bracmort and Mr. Bracmort ... happened to tell him, oh, we're about to shoot Michael Wilson.

> \* \* \* \*

> [Payton] knows where people come out from behind the school. He knows how one person runs this way, another person runs that way. He knows that they have automatic guns, ladies and gentlemen. Ask yourself, he killed someone in that area a month before that, how is it that he knows so much about this shooting?

In spite of the trial court's ruling restricting cross-examination and argument in this area, appellants were able to present their theory that Payton, who had committed the Glenn murder, also participated in the Wilson murder. They were able to elicit evidence, and to argue, that Payton was himself a willing participant in the Wilson murder, had a motive and opportunity to commit it, was biased to protect his own interests and thus, sought to shift the blame to others. However, appellants contend that this was insufficient to satisfy their rights under the Sixth Amendment. They contend that they were precluded from attacking Payton's assertion that he did not commit the Wilson murder through evidence that Payton undertook the earlier Glenn killing on orders from Bracmort.

The government concedes that the trial court's *in limine* ruling precluded appel-

---

16. Harrod's counsel argued, for example:

 Now, Antoine Payton tells you, oh, he's out there on the crime scene. He wasn't there. If he was out there he was probably involved but of course not, oh no, oh no, oh no. He probably didn't do that.

 But let's think about him for a second. As soon as he gets out of jail he commits a murder, the murder of Samuel Glenn, at 16 th and Isherwood right in the same area.

 \* \* \* \*

 ... They saw people in all black, with masks on. If someone's supposed to be out

there and supposed to be a murderer and supposed to know how things go down and he's a planner and he's an executioner, he forgot one key factor and this is why I tell you he's a boldfaced liar, okay, because he said these people did not have on masks. He did not have on masks. This is 15 th at Gales with his baby brother, one year old, going to pick up his mom at Howard on a Saturday evening at nine o'clock. Howard is closed [on] Saturday evening at nine o'clock. We all know that.

lants from presenting to the jury evidence that: (1) Bracmort requested Payton to commit both murders because both had threatened to rob him; (2) the shooter in both murders used the same getaway route, including the parking lot of the Pentacle apartments; (3) Bracmort was the getaway driver in both murders; (4) Bracmort provided Payton money, a car and place to live, inducements for both crimes; and (5) hoodies or masks were worn by the shooters in both homicides. The government contends, however, that the trial court did not abuse its discretion in restricting cross-examination concerning this information nor did its ruling deprive appellants of any constitutional right. The government contends that in any event, any error was harmless beyond a reasonable doubt. In the circumstances of this case, we agree. Any harm in the restriction of this type of evidence was mitigated because appellants, in fact, were able to place before the jury that Payton had murdered Wilson under similar circumstances near the same place as the Wilson homicide and that he had the expressed interest, means and opportunity to be one of those involved in the Wilson homicide. *See Morris v. United States,* 622 A.2d 1116, 1128 (D.C.), *cert. denied,* 510 U.S. 899, 114 S.Ct. 270, 126 L.Ed.2d 221 (1993) (trial court's ruling excluding evidence results in little, if any, prejudice, where much of it gets before the jury). In addition, Payton's credibility was powerfully challenged by evidence of his prior convictions, his plea agreement and the circumstances under which it was obtained. He was depicted through the evidence, and branded in argument, by counsel as a "liar" and a murderer. It is difficult under the circumstances to see how additional elaboration upon his participation in the first murder and connection to the second could have weakened any further the impact of Payton's testimony. *See Springer, supra,* 388 A.2d at 856. The jury had ample reason to disbelieve him if they were so inclined. Payton's testimony was corroborated by other evidence. Antonio Johnson testified that he saw all three appellants dressing in black hoodies and black jeans before the murder, and other witnesses corroborated that the shooters were dressed in the manner that he described. In the circumstances of this case, any error in restricting the evidence was harmless beyond a reasonable doubt.

### III. *Bracmort's Statements and Letters to Johnson*

All of the appellants argue that the trial court erred in admitting into evidence under the co-conspirator hearsay exception a statement Bracmort made to Payton two weeks after the shooting and in two letters written to Payton two years after the shooting. They contend that these statements were inadmissible because they were not in furtherance of the alleged conspiracy. Bracmort also challenges the admission of these letters because they reflected adversely on his character and improperly showed criminal propensity. We consider first Bracmort's separate argument before addressing the issue raised by the other appellants.

### A. *Bracmort's Challenge to Admission of His Letters to Johnson*

Appellant Bracmort argues that the trial court erred in admitting two letters which he wrote to Payton two years after the Wilson homicide. Although the letters were redacted to eliminate some prejudicial references, Bracmort maintains that they should have been excluded entirely because the remaining text impermissibly: (1) "depicted [him] as a man of bad character, even though he did not testify and presented no character witnesses"; (2) "imparted guilt by association, by showing that [he] was consorting with known criminals and was intimately familiar with their activities"; and (3) "implied that [he] was involved in 'other crimes,' perhaps including the murder of Samuel Glenn."

Bracmort appears to recognize that the letters that he wrote are admissible against him as admissions of a party

opponent or "statements of the defendant exception" to the hearsay rule. *See Akins v. United States*, 679 A.2d 1017, 1030 (D.C. 1996). This exception to the hearsay rule operates on a theory that the declarant can refute the admission or explain its circumstances by taking the stand. *Id.* (citing *Chaabi v. United States*, 544 A.2d 1247, 1248–49 (D.C.1988)). "A declarant of a particular statement cannot later complain of its prejudicial admission unless he is denied the opportunity to rebut it." *Id.* Thus, if relevant, and not excludable on other grounds, the letters were admissible at least against Bracmort.[17]

 In denying Bracmort's motion to exclude the letters, the trial court determined that the letters were relevant to show: (1) that a conspiracy existed to conceal the Wilson murder; (2) that Bracmort made threats in order to enforce the concealment conspiracy and as evidence of consciousness of guilt; and (3) the nature of the relationship between Bracmort and Payton, and their conversations. The decision whether to admit evidence is within the sound discretion of the trial court, and this decision will not be disturbed absent a showing of abuse. *Smith v. United States*, 665 A.2d 962, 967 (D.C.1995) (citations omitted). We find no abuse of discretion in the trial court's ruling as it relates to admission of the letters against Bracmort.

The letters were admissible as statements of the defendant and relevant to the issues in the trial, as the trial court found. That Bracmort laced his writing with slang, profanity and even racial epithets does not require the exclusion of relevant evidence. Having reviewed the letters, in light of the record, we conclude that they do not implicate Bracmort in the Glenn homicide nor do they suggest that he engaged in other crimes. Therefore, we discern no basis for exclusion on the grounds of danger of unfair prejudice to Bracmort and find no abuse of discretion in the trial court's ruling.

### B. Applicability of Co-conspirator Exception to Bracmort's Statements and Letters

Appellants McCoy, Burner and Harrod argue that Bracmort's letters to Johnson, written two years after the homicide, were inadmissible hearsay as to them which did not qualify for the co-conspirators exception to the hearsay rule in that they were not made in furtherance of the alleged conspiracy.[18] Similarly, Burner, Harrod and McCoy argue that Bracmort's statements to the witness, Antonio Johnson, two weeks after the shooting were not made in furtherance of the conspiracy, and therefore, should not have been admitted.[19] The erroneous admission of this evidence, these appellants contend, violated their

---

**17.** The statements would not be admissible against a non-confessing co-defendant who had no opportunity to cross-examine the person making the statement, unless within some other exception to the hearsay rule (*e.g.*, the co-conspirator exception). *See Akins, supra,* 679 A.2d at 1030 & n. 12, 1031.

**18.** Bracmort joined in this argument in his reply brief.

**19.** Johnson was permitted to testify as to what Bracmort told him two weeks after the shooting as follows:

he [Bracmort] was going to get something done to Bate [Wilson] and he had told me that I told you I was going to get something done to him. And then he had told me about that he said that he and Lou [McCoy], Rick [Harrod] and Troy [Burner], they was following him [Bate] all day and that was

the best chance they had.... He [Bracmort] said Lou, Rick and Troy were following him all day and Lou, all of them ran from out of Minor—Minor Elementary School and ran up on him and said Little Rick [Harrod] fired him—fired down on him but Troy didn't fire because he said his gun got jammed.... He said Troy kept saying his gun got jammed but he didn't want to do it any way.... [Bracmort said] everyone was harassing Troy because he didn't want to do it any way and they just kept messing with him.... He [Bracmort] had told me an altercation that Rick and Troy had, they were arguing or something, and Rick had chased Troy into a closet ... He [Bracmort] said Rick had a—I mean, Lou had a Glock and Rick had a nine and Troy had [a] .380.

rights under the Confrontation Clause of the Sixth Amendment, bolstered the credibility of a key government witness and was not harmless beyond a reasonable doubt.

Admission of Bracmort's statements under the defendant exception to the hearsay rule in a joint trial would violate the confrontation rights of his co-defendants, unless the statements were admissible against them under some other hearsay exception. *See Akins, supra,* 679 A.2d at 1030–31 (citations omitted). The non-confessing co-defendants are in a different position than the defendant who made the statements, who can refute or explain them. *See id.* at 1030. However, if the statement is made by a co-conspirator in the course of or in furtherance of the conspiracy, they are admissible based on the rationale that co-conspirators are partners in crime whom the law considers to be agents of one another. *Butler v. United States,* 481 A.2d 431, 438 (D.C.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985) (citing *Anderson v. United States,* 417 U.S. 211, 218 n. 6, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974)). The trial court found, and the government argues, that the statements were properly admissible under the co-conspirator exception because the statements made after the murder were intended to conceal the crime, including through intimidation of the witnesses, and were therefore in furtherance of the crime. Appellants argue that, while some acts to conceal a conspiracy may extend the duration of the conspiracy, the co-conspirator exception does not extend it to the limits urged by the government in this case and that the Supreme Court has rejected this argument.

▇▇▇▇ Under FED. R. EVID. 801(d)(2)(E), which this court has adopted, a co-conspirator's out-of-court assertions may be admitted as non-hearsay evidence where the prosecution proves:

(1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the

statements during the course of and in furtherance of the conspiracy.

*Butler, supra,* 481 A.2d at 439 (citing FED. R. EVID. 801(d)(2)(E)). "To be admissible, the statements must satisfy both the 'in the course of' and the 'in furtherance of' requirements." *Williams v. United States,* 655 A.2d 310, 313 (D.C.1995) (citation omitted). However, if it is established that the statements were made in the course of the conspiracy, meeting the "in furtherance of" requirement is not difficult. *Id.* (citations omitted). "Statements made after the conspiracy has ended are not admissible." *Id.* at n. 4 (citing *Fiswick v. United States,* 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196 (1946)).

The government contends that there was evidence of an express conspiracy not only to murder Wilson, but also to avoid detection by the police and retaliation from Wilson's friends. It points to evidence that two hours after the Wilson homicide, the conspirators met and discussed that they should not talk about the murder and that Bracmort confirmed this prior agreement in the two letters he wrote to Payton instructing him to keep his word and his mouth shut. Thus, the government argues, the trial court did not err in concluding that a separate and express conspiracy to conceal the murder still persisted more than two years later, when Payton received Bracmort's letters.

▇▇▇▇ Some acts of concealment may be in furtherance of the conspiracy. *Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *see also Williams, supra,* 655 A.2d at 314 (citations omitted) (statements made during the course of dividing the spoils of a crime); *United States v. Carter,* 760 F.2d 1568, 1581 (11th Cir.1985) (statements made during escape from drug agents). However, the Supreme Court has cautioned that

a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment

done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Grunewald,* 353 U.S. at 405, 77 S.Ct. 963 (emphasis in original). The Supreme Court explained the distinction, using as an example, a kidnaping conspiracy on the one hand, where kidnapers in hiding awaiting a ransom engage in a concealment, or on the other, where having completed the kidnaping and abandoned the kidnaped person, the kidnapers seek to avoid detection. *Id.* The former circumstance would be considered to be in furtherance of the conspiracy, while the latter would not. *Id.* "In the latter case, . . . the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended -- a concomitant, certainly, of every crime. . . ."[20]

Many years ago, the Supreme Court rejected an argument similar to the argument made here by the government. *See Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). In *Krulewitch,* the offense was transporting a woman from New York to Florida for the purpose of prostitution in violation of 18 U.S.C. § 399. The statement in question was made by a named co-conspirator to the complaining witness more than a month and a half after the offense was committed and the co-conspirators had been arrested.[21] *Id.* at 441–42, 69 S.Ct. 716. The government argued that, although the objective of the main conspiracy had been accomplished, the declaration was in furtherance of a continuing subsidiary objective of the conspiracy, *i.e.,* concealment of the alleged criminal transportation conspiracy. *Id.* at 443, 69 S.Ct. 716. The court rejected the government's argument to extend this hearsay exception to that length, stating:

> [t]he rule contended for by the Government could have far-reaching results. For under this rule plausible arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence.

*Id.* at 444, 69 S.Ct. 716. In *Grunewald,* the government advanced a similar argument, but attempted to distinguish it from *Krulewitch* on the ground that the case involved the conspirators' *actual* agreement to conceal the crime, which was charged and proved to be an express part of the original conspiracy. *Grunewald, supra,* 353 U.S. at 401, 77 S.Ct. 963. Finding no meaningful distinction between "actual" and "implied" conspiracies to conceal on the facts presented, the Supreme Court again rejected the government's argument. The facts on which the claim of an actual

---

20. The example provided by the Supreme Court in *Grunewald,* elucidates clearly the distinction between acts of concealment in furtherance of the conspiracy and those done after the central objective of the conspiracy have been secured. The Court explained:

> [k]idnapers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal; in both cases the successful accomplishment of the crime necessitates concealment.

*Grunewald, supra,* 353 U.S. at 405, 77 S.Ct. 963. In contrast, the Court stated that it would not be in furtherance of the conspiracy in this sense for conspirators to take care to avoid detection after the main conspiracy ended, *i.e.,* after abandoning the kidnaped person. *Id.* "In the latter case, . . . the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended -- a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Id.* at 405–06, 77 S.Ct. 963.

21. The statement was one in which the one conspirator asked the other if she had talked, urged her not to do so until they had talked with a lawyer and, to be careful in what she said, and told her that it would be better if they took the blame instead of the man involved in the crime. *Krulewitch, supra,* 336 U.S. at 441, 69 S.Ct. 716.

conspiracy to conceal was based in *Grunewald* consisted of: (1) a criminal conspiracy which the conspirators insisted on keeping secret from the beginning; (2) the preservation of secrecy after "no prosecution" rulings were obtained from the court; and (3) efforts made to conceal the conspiracy, including getting rid of certain records and attempts to persuade one witness to lie, and another not to talk to the grand jury. *Id.* at 403, 77 S.Ct. 963.

█ The government's argument in support of admission of Bracmort's statement to Johnson and letters to Payton are based on a foundation analogous to that in *Grunewald*. Specifically, the government relies on evidence that: (1) appellants met two hours after the killing and discussed that they "shouldn't be talking about" it; (2) two weeks later, Bracmort made an implicit threat to Johnson, a witness, to keep him quiet about the crime; (3) Bracmort wrote Payton about two years later instructing him to keep his word and keep his mouth shut; and (4) Bracmort was concerned about disclosure of the crime to friends of the decedent. Like *Grunewald*, "a conspiracy to conceal is being implied from elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment." *Grunewald, supra,* 353 U.S. at 404, 77 S.Ct. 963. There is no evidence of an express original agreement to continue to act in concert to conceal the crime, particularly two years after its commission. As the Court stated in *Grunewald,*

> every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes ... extend indefinitely the

time within which hearsay declarations will bind co-conspirators.

*Id.* at 402, 77 S.Ct. 963. Therefore, we hold that the statements that Bracmort made to Johnson and to Payton in letters after the main conspiracy to kill Wilson had been accomplished were not made in furtherance of the conspiracy, and therefore not admissible under the co-conspirator exception to the hearsay rule.

█ The government argues that even assuming that the trial court erred in admitting these statements under the co-conspirator exception, the error was harmless beyond a reasonable doubt. It contends that the government's other proof was compelling and did not depend upon Johnson's account of Bracmort's statement or his letters to Payton.[22] Appellants argue that the statements, which were admitted in violation of their confrontation rights, bolstered the credibility of the government's key witness, Payton, and therefore were not harmless beyond a reasonable doubt.

Johnson recounted a statement in which Bracmort told him that the day of the shooting, Burner, Harrod and McCoy followed Wilson all day before all "ran up on him"; that Harrod fired down at Wilson; that Burner did not fire, claiming that his gun got jammed; that Burner did not want to do it anyway; and that Harrod and McCoy got into an altercation with Burner, apparently because of his failure to fire his weapon.[23] While this statement corroborates Payton's eyewitness account of the shooting, the strength of the government's case did not depend upon this evidence. Johnson testified that he observed appellants dressing before the shooting,

---

**22.** The government argues that any error as to Burner was invited because he sought admission of the letters and that any error as to Harrod and McCoy should be reviewed for plain error because neither objected on the grounds that the letters were inadmissible hearsay. A party may not take one position in the trial court, and another on appeal. *Brown v. United States,* 627 A.2d 499, 508 (D.C.1993) (citation omitted). We will not consider such claims on appeal. Where a party does not object during trial, we review for plain error. *Handon v. United States,* 651 A.2d 814, 816 (D.C.1994). We need not decide if this stricter standard of review applies because the error was harmless beyond a reasonable doubt.

**23.** See note 19, *supra,* for the full statement.

and other government witnesses gave an account of the assailants' clothing consistent with Johnson's observations. Without Bracmort's statements, Payton provided eyewitness testimony at trial not only specifying the appellants' roles in the shooting, but also recounting their inculpatory conversation about it after the shooting. Without objection, Johnson testified that McCoy told Bracmort not to tell him about the murder. On this record, we are persuaded that the error in admitting the statement was harmless beyond a reasonable doubt. *See Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824; *Akins, supra,* 679 A.2d at 1032, 1034.

Similarly, any error in the admission of the Bracmort letters was harmless beyond a reasonable doubt. The central challenge to the letters seems to be that they are replete with profanity and reference to gangsters, thereby portraying Bracmort in a bad light and appellants Burner, Harrod and McCoy as bad people by association. The references to the criminal ventures in the portions of the letters admitted did not relate to these appellants.

### IV. *Other Claims of Error*

We need only address briefly appellants' remaining claims of error.

#### A. *Denial of § 23–110 Motion*

Appellants Burner, Harrod and McCoy argue that the trial court abused its discretion in denying, without a hearing, their motion for new trial under D.C.Code § 23–110.[24] They moved for a new trial on the ground that the government failed to turn over to them exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This evidence consisted of a police report containing statements made by Dirk Wright, a witness in the Samuel Glenn murder trial, to a police detective investigating that murder. The statement is printed in the margin.[25] They contend that this evidence was exculpatory in that it provided Payton with a motive for killing Wilson. Thus, they contend, this evidence would have provided additional information that the Wilson murder was connected to the Glenn murder and strengthened their position on the third-party perpetrator defense. In denying the motion, the trial court concluded that appellants had failed to show that the verdict would have been different had this information been available; that disclosure of the information did not change the court's prior analysis of appellants' third-party culpability theory; and that appellants had not put forth a claim in sufficient detail to warrant a hearing.

 The government's failure to disclose to the defense, upon request, information favorable to the accused which is material to guilt or punishment, violates the accused's due process rights. *Brady, supra,* 373 U.S. at 87, 83 S.Ct. 1194. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

The question is not whether the defendant would more likely than not have

---

**24.** D.C.Code § 23–110(a) (1996 Repl.) provides in pertinent part:

A prisoner in custody under sentence of the Superior Court claiming the right to be released upon the ground that (1) the sentence was imposed in violation of the Constitution of the United States or the laws of the District of Columbia ... may move the court to vacate, set aside, or correct the sentence.

**25.** The statement reads as follows:

According to DIRK, BATE [Michael Wilson] told "DEON" that FRANK [Bracmort] killed SAM [Glenn]. In retaliation for spouting off and telling people on the street that FRANK was involved in a killing, FRANK had Bate killed.

received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines the confidence in the outcome of the trial."

*Id.* at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). Where the trial court determines upon a motion for new trial that the undisclosed *Brady* material would not have affected materially the verdict, we consider upon review whether that ruling was reasonable. *Matthews v. United States,* 629 A.2d 1185, 1199 (D.C.1993) (citation omitted); *Derrington v. United States,* 488 A.2d 1314, 1339 (D.C. 1985) (citation omitted).

■ Using the *Bagley* standard, quoted in *Kyles, supra,* we are satisfied that, assuming that the evidence is exculpatory, and even if the information had been disclosed, there is no reasonable probability that the result of the trial would have been different. At best, assuming the admissibility of the evidence, it would have provided an additional motive for Bracmort's involvement and solicitation of the others to participate in the Wilson homicide. We are not persuaded that this additional motive, if disclosed, would have cast doubt on the government's strong case. Appellants contend that it would have supported their theory for admission of the third-party culpability evidence. It is apparent from the trial court's ruling on the § 23–110 motion that it would not have altered its ruling on that issue. As discussed in Part II. D. of this opinion, in spite of the trial court's ruling limiting the presentation of the third-party culpability defense, appel-

lants had an opportunity to present that evidence and to suggest in argument that Payton agreed to, and may have, participated in the Wilson homicide. Under the circumstances, we cannot conclude that there is a reasonable probability that the jury would have accepted appellants' theory that Payton and Bracmort committed the Wilson homicide and that none of the other appellants were involved.

### B. Denial of the Motion to Sever

Appellants Burner, Harrod and McCoy argue that the trial court erred in denying their motions to sever their trials from that of Bracmort. They assert as reasons for this position that: (1) the hearsay statements made by Bracmort to Johnson and Payton, though admissible against Bracmort, were inadmissible against them because the statements did not satisfy the co-conspirator exception to the hearsay rule; and (2) the trial court precluded their evidence that Payton and Bracmort committed the Glenn homicide and that Payton committed the murder at the behest of Bracmort because such evidence was unduly prejudicial to Bracmort, and inconsistent with his defense.

■ There is a strong presumption that "defendants jointly charged with committing an offense will be tried together." *Walker v. United States,* 630 A.2d 658, 663 (D.C.1993) (citing *Taylor v. United States,* 601 A.2d 1060, 1063 (D.C.1991)) (further citation omitted). However, a defendant may rebut this presumption if a sufficient degree of prejudice can be shown under Super. Ct.Crim. R. 14.[26] *Id.* Absent an abuse of discretion, the trial court's denial of a severance motion will not be disturbed. *Id.* (citation omitted). "A finding of abuse of discretion requires a determi-

---

26. Super. Ct.Crim. R. 14 reads as follows:
　　If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other

relief justice requires. In ruling on a motion by a defendant for severance the Court may order the prosecutor to deliver to the Court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

nation that a joint trial did in fact result in an appellant being denied a fair trial and due process of law." *Jackson v. United States,* 329 A.2d 782, 787 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975) (citations omitted). That is not the case here for the reasons discussed in Part II of this opinion, addressing the effect of the admission of Bracmort's statements and letters and the restrictions placed upon admission of evidence of the Glenn homicide.[27] Appellants' defenses were not otherwise irreconcilable.[28] *See Walker,* 630 A.2d at 663 (citation omitted).[29]

### C. *Claim of Improper Prosecutorial Argument*

 Appellants Burner and Bracmort argue that the government engaged in improper and prejudicial rebuttal argument. Specifically, they contend that the prosecutor: (1) rebutted matters not contested in their closing arguments, particularly the paraphrasing of portions of Bracmort's letters; (2) in the crucial context of defining "reasonable doubt," mischaracterized defense arguments concerning the role of Antonio Johnson; (3) shifted the burden of proof; and (4) in effect, commented on appellants' failure to present an alibi or other affirmative defense[s]. In reviewing such claims, we determine first whether the comment was improper, and "[t]hen, viewing the comment or question in context, consideration must be given to the gravity of the challenged conduct along with its 'direct relationship to the issue of

guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case.' " *Hawkins v. United States,* 606 A.2d 753, 756–57 (D.C.1992) (quoting *Hammill v. United States,* 498 A.2d 551, 554 (D.C. 1985)). Reversal is justified where the challenged conduct "bring[s] about substantial prejudice." *Id.* at 757.

 Taking each of appellants' claims of prosecutorial impropriety in turn, we find no error requiring reversal. First, generally the prosecutor is not allowed to advance new arguments in rebuttal, however, the trial court has some discretion to allow broader rebuttal argument. *Hall v. United States,* 540 A.2d 442, 448 (D.C. 1988) (citations omitted). The primary purpose of this rule is to protect the defense from surprise, and there was none here. *Id.* The comments which purportedly strayed beyond the proper scope of rebuttal focused on matters brought out in the opening argument and discussed by Bracmort's counsel. Under the circumstances, we find no impropriety in the prosecutor's argument in this regard. The second claim of improper argument, *i.e.,* mischaracterization of Johnson's role in discussing reasonable doubt, resulted in the trial court sustaining the objection of counsel for Burner, McCoy and Harrod. We discern no prejudice resulting to appellants because of these brief comments. Appellants' third claim is that the prosecutor's remarks, to the effect that no evidence had been adduced showing Payton's

---

27. We need not decide whether, as the government argues, appellants' claim of error should be reviewed under the plain error standard for failure to renew the severance motion. *See Wheeler v. United States,* 470 A.2d 761, 765 (D.C.1983). Even absent plain error review, we conclude that there was no abuse of discretion.

28. As the government points out, all of the appellants' defenses were based on a general denial and a challenge to the credibility of the government's witnesses.

29. A motion to sever based on a claim of irreconcilable defenses may be granted only if it can be shown

> that an "inherent irreconcilability" results from a "clear and substantial contradiction" between respective defenses, *id.* (quoting *Garris v. United States,* 559 A.2d 323, 329 (D.C.1989)), and further "that the irreconcilability creates a danger or risk that the jury will draw an improper conclusion from the existence of the conflicting defenses alone that both defendants are guilty." *Id.*

*Walker,* 630 A.2d at 663 (quoting *Taylor, supra,* 601 A.2d at 1063).

hostility toward appellants or any reason for it, improperly shifted the burden of proof to appellants. A review of the argument does not support this claim. In any event, the trial court's careful and detailed instructions on reasonable doubt ameliorated any potential for prejudice, and the jury is presumed to follow the law as given by the court. *See Allen v. United States*, 603 A.2d 1219, 1224 (D.C.) (en banc), *cert. denied*, 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992) (citations omitted). Finally, Bracmort argues that the prosecutor effectively commented on his failure to testify in discussing how difficult it would be for Johnson and Payton to make up such an elaborate story. He stated before objection, "[i]f you're going to be bringing in, like, four people at once, isn't there the possibility, for instance, with Frank Bracmort, that he'll have a real alibi defense that somebody ——." Taken in context, the comment does not appear to have been manifestly intended to comment on Bracmort's failure to testify or that the jury would take it that way. *See Brewer v. United States*, 559 A.2d 317, 322 (D.C. 1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990) (citations omitted). However, even assuming that this comment was improper, we are satisfied that Bracmort was not substantially prejudiced by it. *See Allen*, 603 A.2d at 1225.[30] The comment was cut off with an objection, which the trial court sustained.

### D. *Sufficiency of the Evidence*

Appellants Bracmort and Burner argue that the evidence was insufficient to convict them of CPWL. In support of this argument, Bracmort contends that there was no evidence that he carried a gun on the night of the shooting. Similarly, Burner maintains that there was no evidence that he fired a gun or that any gun he had was operable. Finally, both Bracmort and Burner submit that the evidence was insufficient to support their convictions based on an aiding and abetting theory of liability. The government concedes that the CPWL convictions of Bracmort and Burner can only be sustained on an aiding and abetting theory.

 It is well-settled in the District of Columbia that "[o]ne who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed in furtherance of the common purpose ... or is the natural or probable consequence of the act intended." *Lee v. United States*, 699 A.2d 373, 384 (D.C. 1997) (quoting *West v. United States*, 499 A.2d 860, 865 (D.C.1985) (further citations omitted) (internal quotation marks omitted)). To support a conviction for carrying a pistol without a license on an aiding and abetting theory of liability, there must be a showing of "[s]ome conduct by an alleged accomplice of an affirmative character in furtherance of the act of carrying the pistols by the ... principals." *Halicki v. United States*, 614 A.2d 499, 503 (D.C. 1992) (further citations omitted).

 The government relies on evidence of Bracmort's and Burner's participation in the larger scheme to murder Wilson as support for the conviction. However, *Halicki* requires "[s]ome conduct by an alleged accomplice of an affirmative character in furtherance of the *act of carrying the pistols* by the ... principals [to] be established." *Halicki, supra*, 614 A.2d at 503 (citing *Jefferson v. United States*, 463 A.2d 681, 683 (D.C.1983) (other citation omitted)). There was no evidence that Bracmort and Burner did anything to further the carrying of the pistols of Harrod and McCoy or did anything in connection with the weapons of the shooters. Under *Halicki*, more is required than general participation in the criminal venture

---

**30.** "In assessing cases of alleged prosecutorial impropriety, we consider its gravity, its relationship to the guilt or innocence of the accused, the effect of any corrective action, and the strength of the government's case." *Allen*, 603 A.2d at 1225 (citing *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991)). Considering those factors, appellants' claim does not require reversal.

for conviction of aiding and abetting the carrying of a pistol without a license. Even viewing the evidence in the light most favorable to the government, as we must, we cannot conclude that the evidence was adequate to convict Bracmort and Burner of CPWL on an aiding and abetting theory. *See Chambers v. United States,* 564 A.2d 26, 30–31 (D.C.1989) (citations omitted).

▮▮▮▮▮ Appellant Burner argues that the trial court erred in denying his motion for judgment of acquittal in that the evidence was insufficient to convict him of the first-degree premeditated murder of Wilson and assault with intent to kill Kinard. The evidence was sufficient to convict Burner of both offenses on an aiding and abetting theory. To prove the crimes on this theory, there must be evidence from which a reasonable jury can find that the defendant was " 'involved in the criminal activity to the extent that he in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed.' " *Taylor, supra,* 601 A.2d at 1063 (quoting *Wesley v. United States,* 547 A.2d 1022, 1026 (D.C.1988) (citations and internal quotation marks omitted)). Here, there was evidence that Burner agreed "in principle" to kill Wilson, dressed for the occasion, and went to the place where the murder was to occur with the people with whom he had conspired to engage in this criminal endeavor. According to Payton's testimony, Burner stood near the scene, and after Harrod and McCoy started to chase the victims, Burner covered his head with the hood and had the gun in his hand. He had planned to be, and the jury could reasonably infer, that he was a part of the team which would assure that the intended victim had no escape. There was some evidence that only because his gun jammed did Burner not succeed in personally shooting Wilson. This evidence was also sufficient to convict Burner of the assault upon Kinard under a theory of vicarious liability. Viewing the evidence in the light most favorable to the government, it can be said fairly that a reasonable juror could find guilt beyond a reasonable doubt. " 'It is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury.' " *Chambers, supra,* 564 A.2d at 31 (quoting *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976)).

### E. *The PFCV Count*

Appellants argue, and the government concedes, that PFCV was not a crime at the time of the commission of the crime in this case.[31] Therefore, the appellants' convictions for PFCV must be vacated.

For the foregoing reasons, the judgment of conviction of the trial court is affirmed, except for appellants' convictions of possession of a firearm during commission of a crime of violence (PFCV) and the convictions of Burner and Bracmort for carrying a pistol without a license (CPWL). The case is remanded to the trial court with instructions to vacate the CPWL count as to Burner and Bracmort and the PFCV count as to all appellants.

*So ordered.*

---

**31.** The other appellants joined in this argument.